UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

v.

FUNDS IN THE AMOUNT OF $19,901,190.42 SEIZED FROM COMPANY A ACCOUNT NUMBER XXXX9087 HELD IN THE NAME OF LIM XIANG JIE CEDRIC;

FUNDS IN THE AMOUNT OF $37,905,571.53 SEIZED FROM COMPANY A ACCOUNT NUMBER XXXX8688 HELD IN THE NAME OF MING-SHEN CHENG;

FUNDS IN THE AMOUNT TOF $46,318,096.30 SEIZED FROM COMPANY A ACCOUNT NUMBER XXXX6638 HELD IN THE NAME OF KO SEN CHAI;

FUNDS IN THE AMOUNT OF $55,348,559.17 SEIZED FROM COMPANY A ACCOUNT NUMBER XXXX2412 HELD IN THE NAME OF KING SUNG WONG;

FUNDS AND SECURITIES IN THE AMOUNT OF $36,933,675.50 SEIZED FROM COMPANY B ACCOUNT NUMBER XXXX1498 HELD IN THE NAME OF SIONG WEE VUN;

FUNDS IN THE AMOUNT OF $72,842.36 SEIZED FROM COMPANY B ACCOUNT NUMBER XXXX1535 HELD IN THE NAME OF CHIEN LUNG MA;

AND

FUNDS AND SECURITIES IN THE AMOUNT OF $18,404,800.39 SEIZED FROM COMPANY B ACCOUNT NUMBER XXXX1401 HELD IN THE NAME OF KOK WAH WONG

Defendants.

## VERIFIED COMPLAINT FOR FORFEITURE

The UNITED STATES OF AMERICA, by MORRIS PASQUAL, Acting United States Attorney for the Northern District of Illinois, for its verified complaint against the above-named defendant property, alleges in accordance with Supplemental Rule G(2) of the Federal Rules of Civil Procedure as follows:

### Nature of the Action

1. This is a civil action brought to forfeit property seized by the United States government for violations of federal law that provide for the seizure, forfeiture, and disposal of certain property to the United States.

2. This action is an *in rem* legal proceeding against property, not against an individual, to determine rights in the property that are conclusive against the entire world.

3. This complaint is verified by the attached Verification of Joseph Holzman, Federal Bureau of Investigation ("FBI") Special Agent ("SA Holzman"), which is fully incorporated herein.

## The Defendant *in rem*

4. The defendant *in rem* consists of the following property:

(a) Funds in the amount of $19,901,190.49 seized from Company A account number XXXX9087 held in the name of Lim Xiang Jie Cedric ("**Subject Account 1**");

(b) Funds in the amount of $37,905,571.53 seized from Company A account number XXXX8688 held in the name of Ming-Shen Cheng ("**Subject Account 2**");

(c) Funds in the amount of $46,318,096.30 seized from Company A account number XXXX6638 held in the name of Ko Sen Chai ("**Subject Account 3**");

(d) Funds in the amount of $55,348,559.17 seized from Company A account number XXXX2412 held in the name of King Sung Wong ("**Subject Account 4**");

(e) Funds and securities in the amount of approximately $36,933,675.50 seized from Company B account number XXXX1498 held in the name of Siong Wee Vun ("**Subject Account 5**");

(f) Funds in the amount of $72,842.36 seized from Company B account number XXXX1535 held in the name of Chien Lung Ma ("**Subject Account 6**"); and

(g) Funds and securities in the amount of approximately $18,404,800.39 seized from Company B account number XXXX1401 held in the name of Kok Wah Wong ("**Subject Account 7**").

5. The defendant property was seized on or about February 10, 2025 and February 28, 2025.

6. The defendant property is currently in the custody of the United States Marshals Service.

## Jurisdiction and Venue

7. This Court has jurisdiction over an action commenced by the United States under Title 28, United States Code, Section 1345, and over an action for forfeiture under Title 28, United States Code, Section 1355(a).

8. This Court has *in rem* jurisdiction over the defendant property pursuant to Title 28, United States Code, Section 1355(b)(1)(A), because acts giving rise to this action occurred within the Northern District of Illinois.

9. Venue is proper in the Northern District of Illinois pursuant to Title 28, United States Code, Section 1395(b)(1)(A), because acts giving rise to this action occurred in this district.

## Statutory Basis for Forfeiture

10. The defendant property is subject to forfeiture pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(A), as property involved in a transaction or attempted transaction in violation of Title 18, United States Code, Section 1957, or any property traceable to such property. The defendant property is further subject to forfeit pursuant to the provisions of Title 18, United States Code, Section 981(a)(1)(C), as property that constitutes and is derived from proceeds traceable to violations of Title 18, United States Code, Sections 1343, 1348, 1349, or 1957.

## Specific Allegations

11. According to documents filed by China Liberal Education Holdings ("CLEU") with the United States Securities and Exchange Commission ("SEC") on or about December 23, 2024, CLEU was a holding company incorporated in the Cayman

Islands on February 25, 2019. CLEU purported to conduct all operations through subsidiaries in China. The mission of CLEU was to "provide China's students with the tools to excel in a global environment" through its operating companies. In SEC filings, CLEU purported to "provide a wide variety of educational services and products intended to address the needs of schools and our students."

12. According to publicly available information, CLEU stock traded on the Nasdaq Stock Market LLC ("NASDAQ") stock exchange.

13. According to its annual report filed with the SEC on or about April 15, 2024, CLEU reported operating at a net loss of $4,872,366 in 2023. CLEU further reported a net loss of $1,996,536 in 2022 and a net loss of $1,249,881 in 2021. CLEU reported in unaudited financial statements with the SEC on or about October 11, 2024, that it operated through the first six months of 2024 at a net loss of $4,724,773.

14. On or about August 23, 2024, CLEU was notified by NASDAQ that the company was out of compliance with NASDAQ's minimum bid price requirement. NASDAQ required listed securities to maintain a minimum bid price of $1.00 per share. NASDAQ notified CLEU that its stock had been below the minimum threshold since on or about July 8, 2024. CLEU was advised if its stock did not have a closing bid price of $1 for a minimum of 10 consecutive business days, CLEU would be removed from the NASDAQ exchange.

15. According to a CLEU filing with the SEC on or about October 8, 2024, CLEU had a total of 278,816,663 outstanding shares. On that date, CLEU's stock at market close had a share price of approximately $0.315 per share.

16. On or about December 23, 2024, CLEU issued 160,000,000 additional shares, for a total of approximately 438,816,663 outstanding shares. On that date, CLEU stock at market close had a share price of approximately $0.162 per share for a market cap of approximately $71 million.

17. On December 24, 2024, CLEU executed a "share consolidation," consolidating every 15 ordinary shares into one ordinary share, for a total of approximately 29,254,444 outstanding shares. On that date, CLEU stock at market close had a share price of approximately $2.695 per share for a market cap of approximately $79 million.

18. In December 2024 and January 2025, at a time when the publicly reported number of outstanding CLEU shares totaled approximately 29 million, CLEU issued 240 million ordinary shares to certain individuals. But CLEU did not file documentation with the SEC reflecting the new outstanding share total of approximately 269 million shares until on or about January 27, 2025.

19. Between approximately January 10, 2025, and January 15, 2025, **Subject Accounts 1-4** collectively received deposits of 33,906,975 shares of CLEU, which purportedly were issued from CLEU at a cost of $0.60 per share. **Subject Accounts 1-4** subsequently participated in what is commonly known as a "pump and dump" scheme to fraudulently manipulate the price of stock in CLEU. During the time individuals in China, who were impersonating successful U.S.-based investment advisers, advised numerous victims throughout the United States to buy CLEU at

inflated prices, **Subject Accounts 1-4** sold 31,484,573 shares on or about January 22, 2025 and January 23, 2025, for a total of approximately $176,104,984.

20. On January 23, 2025, Company A restricted further activity in these accounts, so that **Subject Accounts 1-4** were not able to sell any more CLEU stock. After these accounts were restricted, **Subject Accounts 1-4** manipulated the CLEU market by submitting "buy" orders and then quickly cancelling the orders, which artificially inflated the volume of trades in CLEU and made it appear to the open market the demand for CLEU stock remained high.

21. Between January 17, 2025, and January 29, 2025, **Subject Accounts 5-7** collectively received deposits of 21,170,680 shares of CLEU, which purportedly were issued from CLEU at a cost of $0.60 per share. **Subject Accounts 5-7** subsequently participated in what is commonly known as a "pump and dump" scheme to fraudulently manipulate the price of stock in CLEU. During the time individuals in China, who were impersonating successful U.S.-based investment advisers, advised numerous victims throughout the United States to buy CLEU at inflated prices, **Subject Accounts 5-7** sold all their 21,170,680 shares between January 22, 2025, and January 29, 2025, for a total of approximately $131,766,360.80.

22. Finally, after the market became aware of the additional 240,000,000 in outstanding shares of CLEU, the share price of CLEU dropped from a closing price of approximately $7.75 on January 29, 2025, to an opening price of approximately $1.02 on January 30, 2025.

23. According to records and witness statements gathered by law enforcement through this investigation, starting in or about September 2024, advertisements on social networks such as Facebook and Instagram offered investment advice opportunities. Individuals who clicked on the advertisements were directed to private WhatsApp groups led by individuals purporting to be successful U.S.-based investment advisors. However, according to records obtained by law enforcement, the "advisors" were actually based in China and were not the individuals they purported to be. The "advisors" provided guidance to the investors, including investors located in the Northern District of Illinois, building trust over the course of weeks or months. Starting on or about January 22, 2025, the advisors started directing the investors to purchase shares of CLEU.

24. According to Individual A, s/he responded to a Facebook advertisement on or about November 14, 2024, and began communicating with individuals purporting to be co-founders of Company C, a Chicago-based investment advisory firm, "Individual C" and his assistant "Individual D."

25. According to the public website for Company C, it did not provide stock recommendations or investment advice via WhatsApp and any such messages received from individuals purporting to be their employees Individual C and Individual D were fraudulent.

26. According to Individual A and a law enforcement review of their WhatsApp messages, "Individual D" provided investment advice and friendly communications through January 21, 2025. On January 22, 2025, "Individual D" instructed Individual A to purchase CLEU shares. Individual A was instructed to set the buy price to $5.37 per share and was advised that the expected return on the investment would be up to 380% over 20 to 30 trading days. Individual A purchased approximately 102,100 shares.

27. According to Individual A, "Individual D" subsequently encouraged Individual A to sell his/her other stocks to obtain more funds and invest more in CLEU. On January 23, 2025, "Individual D" instructed Individual A to purchase more CLEU shares at a buy price of $6.60 per share. Individual A purchased approximately 30,410 shares on January 23, 2025. "Individual D" encouraged Individual A to allocate $500,000 to participate in further trading. Individual A was told there was a "merger and acquisition" in the near future which would lead to a significant rise in the CLEU stock price. Individual A was advised within a week it would be too late to invest and profit from the stock.

28. According to Individual A, on January 24, 2025, "Individual D" instructed Individual A to purchase CLEU stock at a price of $6.89 per share. Individual A purchased approximately 42,050 shares.

29. According to Individual A, on January 27, 2025, "Individual D" further encouraged Individual A to purchase more CLEU shares, claiming to have confidential non-public information regarding a pending acquisition of CLEU that would "immediately turn [CLEU's] losses into profits" and that CLEU's shares would rise above $25 per share when the acquisition was announced. On January 29, 2025 "Individual D" instructed Individual A to hold on to his/her shares of CLEU and wait before selling.

30. Moreover, according to Individual B, s/he responded to a Facebook advertisement and on or about September 29, 2024, began communicating with individuals purporting to be associated with Company D, an investment firm based in Boston, Massachusetts. Individual B received investment guidance from an individual claiming to be "Individual E" from Company D.

31. According to Individual B and a law enforcement review of their WhatsApp messages, "Individual E" provided investment advice and friendly communications through January 21, 2025, and guaranteed that Individual B would be compensated for any losses after a trial period. On January 22, 2025, "Individual E" instructed Individual B to purchase CLEU shares. Individual B was instructed to set the buy price to $5.39 per share and was advised the expected return on their investment would be up to 380% over 20 to 30 trading days. Individual B told "Individual E" s/he was nervous and did not want to purchase any CLEU shares at that time.

32. According to Individual B, on January 23, 2025, "Individual E" instructed Individual B to purchase CLEU shares at a buy price of $6.20 per share. "Individual E" claimed this was a "rare low-price trading opportunity." Individual B subsequently purchased 1,800 CLEU shares. "Individual E" claimed to have information regarding a pending acquisition of CLEU, and that the price of CLEU stock would rise up to $28 when the news was made public. On January 29, 2025, "Individual E" encouraged Individual B to hold on to his/her CLEU shares and to purchase more if s/he could.

33. According to records obtained by law enforcement during this investigation, the WhatsApp accounts used by the purported U.S.-based investment firms and advisors were actually used by individuals in China.

34. According to records from Company A, on or about January 14, 2025, Ming-Shen Cheng transferred 9,278,975 shares of CLEU into **Subject Account 2**

and King Sung Wong transferred 9,329,500 shares of CLEU into **Subject Account 4**. On or about January 15, 2025, Lim Xiang Jie Cedric transferred 6,110,000 shares of CLEU into **Subject Account 1** and Ko Sen Chai transferred 9,188,500 shares of CLEU into **Subject Account 3**.

35. According to records and information received from Company A, the 33,906,975 CLEU shares transferred to **Subject Accounts 1-4** were received via transfer agent Company E. However, NASDAQ and other public sources at the time identified there to be only approximately 29 million outstanding shares of CLEU. Company E advised Company A the shares were issued directly from CLEU and were not restricted from trading. On January 21, 2025, Company A responded to inquiries from Ko Sen Chai and Ming-Shen Cheng advising their shares were not restricted and were available to be traded.

36. On January 22, 2025, **Subject Accounts 1-3** began selling their CLEU shares. On that date, the three accounts sold approximately 22,155,073 CLEU shares at an average price of $5.36.

37. On January 23, 2025, **Subject Account 4** sold approximately 9,329,500 CLEU shares at an average price of $6.17.

38. According to information provided by Company A, after market close on January 23, 2025, Company A prohibited **Subject Accounts 1-4** from selling any further shares.

39. The following chart depicts the CLEU shares sold by **Subject Accounts 1-4** on January 22, 2025 and January 23, 2025:

| Account | Quantity of CLEU Shares Sold | Total Dollar Amount |
|---|---|---|
| **Subject Account 1** | 3,687,598 | $19,901,190.49 |
| **Subject Account 2** | 9,278,975 | $49,535,081.17 |
| **Subject Account 3** | 9,188,500 | $49,199,716.81 |
| **Subject Account 4** | 9,329,500 | $57,468,995.95 |

40. Following this restriction, **Subject Accounts 1-4** entered numerous CLEU trades then cancelled them prior to execution. Between January 24, 2025, and January 29, 2025, **Subject Accounts 1-4** entered and quickly more than approximately 2,500 orders for a combined approximately 56 million shares.

41. According to records from Company B, on or about January 9, 2025, Chien Lung Ma submitted a form requesting to transfer 8,949,270 shares of CLEU into **Subject Account 6**. On or about January 10, 2025, Siong Wee Vun submitted a form requesting to transfer 7,285,000 shares of CLEU into **Subject Account 5**. On or about January 15, 2025, Kok Wah Wong submitted a form requesting to transfer 4,936,410 shares of CLEU into **Subject Account 7**.

42. According to records and information received from Company B, on the transfer requests forms and in response to due-diligence inquiries from Company B, all three individuals indicated they were not connected to any other owner of CLEU shares. However, IP records from Company B show that on December 31, 2024, both **Subject Accounts 5** and **6** were logged in using the same IP address.

43. Further, according to records and information received from Company B, in response to being asked as to the purpose of the respective stock transfers and whether they intended to either sell or hold the shares at the time of these transfers, all three individual account holders told Company B they intended to short-term hold

the shares. However, as explained in further detail below, **Subject Accounts 5-7** began selling all their CLEU shares soon after the shares were deposited into their accounts.

44. The 21,170,680 CLEU shares transferred to **Subject Accounts 5-7** were received via transfer agent Company E. However, as discussed above, NASDAQ and other public sources at the time the individual account holders requested the share transfers were aware of only approximately 29 million outstanding shares of CLEU. Company E advised Company B the shares were issued directly from CLEU and were not restricted from trading.

45. According to records from Company B, on January 17, 2025, 4,936,410 shares of CLEU were deposited into **Subject Account 7**. On the morning of January 22, 2025, **Subject Account 7** began selling CLEU shares. Prior to selling CLEU shares, **Subject Account 7** had an account balance of approximately $40,142.10. Within a half hour of when **Subject Account 7** began selling its CLEU shares, it had sold all 4,936,410 shares in the account, for a total of $26,186,430.61. On or about January 27, 2025, **Subject Account 7** bought 200,000 shares of security "Investment Fund 1" for a total of approximately $18,337,579.83

46. On January 21, 2025, 8,949,270 shares of CLEU were deposited into **Subject Account 6**. Prior to selling CLEU shares, **Subject Account 6** had an account balance of approximately $12,650.00. Between January 22, 2025 and January 23, 2025 **Subject Account 6** sold all 8,949,270 of its CLEU shares, for a total of $48,901798.40. On or about January 27, 2025, **Subject Account 6** bought

335,000 shares of security "Investment Fund 2" for a total of approximately $33,706,798.93.

47. On January 28, 2025 7,285,000 shares of CLEU were deposited into **Subject Account 5**. On January 29, 2025, **Subject Account 5** began selling its CLEU shares. Prior to selling CLEU shares, **Subject Account 5** had an account balance of approximately negative $10,425.00. Within 20 minutes of when **Subject Account 5** began selling its CLEU shares, it had sold all 7,285,000 shares in the account, for a total of $56,678,131.79. On or about January 31, 2025, **Subject Account 5** bought 352,183 shares of security "Investment Fund 3" for a total of approximately $17,733,919.06.

48. According to a CLEU filing with the SEC, on or about January 27, 2025, CLEU identified that on December 31, 2024, it had exchanged 320 million warrants for newly issued 240 million outstanding shares purchased at a cost of $0.60 per share, and that as of January 27, 2025, the total number of CLEU outstanding shares was 269,325,176.

49. At the time of NASDAQ market close on January 29, 2025, the market had not yet updated to reflect the above noted January 27, 2025, filing, and the market still listed the total number of CLEU outstanding shares as approximately 29.5 million. CLEU stock closed at a price of $7.75 per share on January 29, 2025, for a market cap of approximately $228 million.

50. When the NASDAQ opened January 30, 2025, the market reflected the outstanding shares of CLEU to be 269,325,176. The January 30, 2025, opening price

of CLEU stock subsequently dropped to approximately $1.025 per share. At market close on the same date, shares of CLEU were priced at $0.148 per share. As a result, U.S.-based retail investors who had purchased shares of CLEU prior to the market correction of CLEU's stock price lost almost the entirety of their investment.

## Conclusion

51. For the reasons stated herein and in the attached affidavit, incorporated by reference herein, the foregoing defendant property was involved in a transaction or attempted transaction in violation of section 1957, or is property traceable to such property, and therefore is subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(A). Furthermore, the foregoing defendant property was derived from proceeds traceable to violations of Title 18, United States Code, Sections 1343, 1348, 1349, or 1957, and therefore is subject to forfeiture and condemnation pursuant to Title 18, United States Code, Section 981(a)(1)(C).

WHEREFORE, based upon the aforementioned facts and circumstances, Plaintiff, United States of America, by and through its undersigned counsel, and pursuant to Fed. R. Civ. P. Supp. G(3)(b), respectfully, prays:

1) That process issue for an arrest warrant *in rem* for the defendant properties, which Plaintiff will execute in accordance with 28 U.S.C. § 1355(d) and Fed. R. Civ. P. Supp. G(3)(c);

2) That due notice be given to all parties to appear and show cause why forfeiture of the defendant properties to the United States in accordance with the claims herein set forth should not be decreed;

3) That this Court enter a judgment of forfeiture for the defendant properties to the United States; and

4) That this Court grant Plaintiff all other relief as it may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

MORRIS PASQUAL
Acting United States Attorney
Northern District of Illinois

By: */s/ Jared Hasten*
JARED HASTEN
Assistant United States Attorney
219 South Dearborn., Rm. 500
Chicago, Illinois 60604
(312) 353-5300

Dated: March 20, 2025