| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Plaintiff, | |
| v. | No. 25 C 2965 |
| FUNDS IN THE AMOUNT OF $37,905,571.53 SEIZED FROM COMPANY A ACCOUNT NUMBER XXXX8688 HELD IN THE NAME OF MING-SHEN CHENG, | Hon. Jorge L. Alonso |
| Defendant. | |

## CLAIMANT'S MOTION TO VACATE DEFAULT JUDGMENT

**TABLE OF CONTENTS**

Page

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL BACKGROUND .................................................................................................2

    A.     Mr. Cheng's Trading of CLEU Shares ................................................................2

    B.     The Government's Civil Forfeiture Proceeding ...................................................4

LEGAL STANDARD ..........................................................................................................6

ARGUMENT .....................................................................................................................6

I.     Good Cause To Set Aside Default Judgment Exists. ..............................................6

    A.     Good Cause To Vacate The Default Judgment Exists Because Mr. Cheng's Failure To Respond Was Not Willful. ..................................................7

    B.     Good Cause To Vacate The Default Judgment Exists Because Damages Are Disproportionate To The Wrong. ...............................................8

II.     Mr. Cheng Acted Promptly To Vacate the Default Judgment. ................................9

    A.     Mr. Cheng Took Immediate Action To Retain Counsel And Correct The Default. ...............................................................................................9

    B.     Good Cause Exists For Any Delay In Mr. Cheng's Response. ...........................10

    C.     The Government Suffers No Cognizable Prejudice from Setting Aside the Default. ....................................................................................10

III.     Mr. Cheng Has Meritorious Defenses ................................................................11

    A.     Mr. Cheng Has Meritorious Defenses To Wire Fraud Charge. ............................12

        1.     Scheme to Defraud ...........................................................................12

            (a)     Material Misrepresentations ............................................13

            (b)     Knowing Participation .....................................................15

        2.     Intent to Defraud ..............................................................................16

    B.     The Securities Fraud Claims Fail. .....................................................................17

C.     Mr. Cheng Has An Innocent Owner Defense. ...........................................................17

CONCLUSION ........................................................................................................................19

# <u>TABLE OF AUTHORITIES</u>

<u>Page(s)</u>

## <u>Cases</u>

*1025 W. Addison St. Apartments Owner, LLC v. Grupo Cinemex, S.A. de C.V.*,
2021 WL 2136073 (N.D. Ill. May 26, 2021) .............................................................. 8

*Acme Propane, Inc. v. Tenexco, Inc.*,
844 F.2d 1317 (7th Cir. 1988) ........................................................................... 13, 14

*Allen Russell Pub., Inc. v. Levy*,
109 F.R.D. 315 (N.D. Ill. 1985) ......................................................................... 10, 11

*Bieganek v. Taylor*,
801 F.2d 879 (7th Cir. 1986) ................................................................................ 7, 11

*CFTC v. Garofalo*,
2010 WL 11245430 (N.D. Ill. 2010) ......................................................................... 8

*Cracco v. Vitran Exp., Inc.*,
559 F.3d 625 (7th Cir. 2009) ................................................................................... 6, 7

*Ellingsworth v. Chrysler*,
665 F.2d 180 (7th Cir. 1981) ....................................................................................... 7

*Escamilla v. United States*,
62 F.4th 367 (7th Cir. 2023) ....................................................................................... 9

*Fox v. Hagene*,
2024 WL 3442979 (S.D. Ill. July 17, 2024) ............................................................. 6

*FTC v. Construct Data Publishers*,
2014 WL 7004999 (N.D. Ill. Dec. 11, 2014) ......................................... 6, 8, 9, 10, 11

*Hamilton v. Illinois Cent. R. Co.*,
2008 WL 78784 (S.D. Ill. Jan. 7, 2008) .................................................................... 7

*JMB Mfg., Inc. v. Child Craft, LLC*,
799 F.3d 780 (7th Cir. 2015) ................................................................................... 8, 9

*Jones v. Phipps*,
39 F.3d 158 (7th Cir. 1994) ........................................................................................ 6

*Leonard v. Texas*,
137 S. Ct. 847 (2017) ................................................................................................... 1

*M&N Trading, LLC v. Bank of Am. Securities, Inc.*,
    2024 WL 4651857 (N.D. Ill. Nov. 1, 2024) ........................................................... 15

*Neder v. United States*,
    527 U.S. 1 (1999) ..................................................................................................... 13

*Parker v. Scheck Mechanical Corp.*,
    772 F.3d 502 (7th Cir. 2014) .................................................................................. 11

*Sims v. EGA Prods., Inc.*,
    475 F.3d 865 (7th Cir. 2007) .................................................................................... 8

*Smith v. Widman Trucking & Excavating, Inc.*,
    627 F.2d 792 (7th Cir. 1980) ................................................................................9, 10

*Strabala v. Zhang*,
    318 F.R.D. 81 (N.D. Ill. 2016) ..........................................................................8, 9, 10

*Sun v. Bd. of Trs. of Univ. of IL*,
    473 F.3d 799 (7th Cir. 2007) ..................................................................................... 6

*Transnor (Bermuda) Lt. v. BP N. Am. Petroleum*,
    738 F. Supp. 1472 (S.D.N.Y. 1990) ........................................................................ 15

*Tygris Asset Fin., Inc. v. Szollas*,
    2010 WL 2266432 (N.D. Ill. 2010) ........................................................................... 8

*United States. v. $22,050.00 U.S. Currency*,
    595 F.3d 138 (6th Cir. 2010) .................................................................................. 12

*United States v. $448,342.85*,
    969 F.2d 474 (7th Cir. 1992) .................................................................................. 18

*United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*,
    783 F.3d 607 (7th Cir. 2015) .................................................................................. 18

*United States v. Armbruster*,
    2021 WL 5206581 (E.D. Wis. Nov. 8, 2021) .......................................................... 17

*United States v. Beaman*,
    128 F. Supp. 2d 1188 (N.D. Ind. 2001) .................................................................. 18

*United States v. Chanu*,
    40 F.4th 528 (7th Cir. 2022) ..............................................................................16, 17

*United States v. Coffman*,
    94 F.3d 330 (7th Cir. 1996) .................................................................................... 14

iv

*United States v. Coscia*,
    866 F.3d 782 (7th Cir. 2017) ............................................................. 17

*United States v. Greenlaw*,
    84 F.4th 325 (5th Cir. 2023) .............................................................. 16

*United States v. Gustafson*,
    130 F.4th 608 (7th Cir. 2025) ............................................................ 12

*United States v. Miller*,
    953 F.3d 1095 (9th Cir. 2020) ...................................................... 16, 17

*United States v. Schampers*,
    2023 WL 3001896 (E.D. Wis. Apr. 19, 2023) ................................... 16

*United States v. Schwartz*,
    2024 WL 3226575 (N.D. Ill. June 28, 2024) ................................ 14, 15

*United States v. Smith*,
    555 F. Supp. 3d 563 (N.D. Ill. 2021) ................................................ 17

*United States v. Weimert*,
    819 F.3d 351 (7th Cir. 2016) ............................................................. 13

*United States v. Yass*,
    636 F. Supp. 2d 1177 (D. Kan. 2009) ............................................... 18

## Rules / Statutes

7 U.S.C. § 6c(a)(5)(C) ............................................................................ 15

18 U.S.C. § 981(a)(1) ............................................................................. 11

18 U.S.C. § 983(d) ............................................................................ 12, 18

18 U.S.C. § 1343 .............................................................................. 11, 17

18 U.S.C. § 1344(1) ............................................................................... 17

18 U.S.C. § 1348 .............................................................................. 11, 17

18 U.S.C. § 1349 .................................................................................... 11

18 U.S.C. § 1957 .................................................................................... 11

Fed. R. Civ. P. 55(c) ................................................................................ 6

Fed. R. Civ. P. 60(b) ............................................................................ 6, 7

Claimant Ming-Shen Cheng, through undersigned counsel, respectfully submits this Motion to Vacate Default Judgment. In support, Mr. Cheng states as follows.

## PRELIMINARY STATEMENT

Civil forfeiture "often enable[s] the government to seize the property without any predeprivation judicial process and to obtain forfeiture of the property even when the owner is personally innocent." *Leonard v. Texas*, 137 S. Ct. 847, 847 (2017) (Thomas, J., respecting the denial of certiorari). Mr. Ming-Shen Cheng exemplifies this injustice—an innocent Taiwanese owner who has never been tried or convicted, yet whose $37 million in assets were forfeited without opportunity to present his defenses.

The government sought and obtained this default judgment against Mr. Cheng, a lifelong resident of Taiwan who has never been to the United States. As a foreign national unfamiliar with the American legal system, Mr. Cheng undertook diligent efforts to engage experienced U.S. counsel in civil forfeiture matters. Before he could complete this process, the government obtained a default judgment. Mr. Cheng now seeks an opportunity to vindicate his rights by asking this Court to vacate the default judgment and allow him to put the government to its proof.

The Seventh Circuit strongly favors trial on the merits over default judgment, and principles of due process demand that Mr. Cheng be allowed to defend against the government's allegations. It is especially appropriate here because all three factors courts apply when determining whether to vacate default judgments weigh in favor of vacatur.

*First*, good cause exists. Mr. Cheng did not willfully disregard court deadlines but reasonably needed time to secure specialized U.S. counsel as a foreign national unfamiliar with federal litigation. The $37 million forfeiture creates significant prejudice to Mr. Cheng, while the government suffers only litigation delay—which does not constitute legal prejudice and cannot justify denying due process.

*Second*, Mr. Cheng took quick action to correct the default. Within days of learning about the default judgment, he engaged counsel who promptly informed this Court of his intent to seek vacatur.

*Third*, and most importantly, Mr. Cheng has multiple meritorious defenses that warrant adjudication on the merits. He has an innocent owner defense—he owns the forfeited funds and has no knowledge of any purported criminal scheme. Additionally, the government's complaint is devoid of evidence that would establish either that (1) Mr. Cheng was involved in the predicate wire fraud or securities fraud charges or (2) that his funds were involved in or traceable to those offenses. The government put forth no evidence, for example, that Mr. Cheng made material misrepresentations, participated in any scheme to defraud, or acted with intent to defraud. The government also fails to connect Mr. Cheng's legitimate trading profits to any alleged misconduct. Mr. Cheng is entitled to a presumption of innocence and the opportunity to demonstrate these defenses rather than be deprived of $37 million through procedural default.

## FACTUAL BACKGROUND

### A. Mr. Cheng's Trading of CLEU Shares

Claimant Ming-Shen Cheng is a lifelong resident of Taiwan who has never been to the United States. Declaration of Ming-Shen Cheng in Opposition to The Motion to Strike and Dismiss Any Filings by Claimant Ming-Shen Cheng ("Cheng Decl."), Dkt. 19 ¶¶ 2, 3. He does not own any property in the United States other than the funds at issue in this case. *Id.* ¶ 3. Having lived his entire life in Taiwan, Mr. Cheng does not speak, read, or write English and has relied on translation assistance to respond to this action. *Id.* ¶ 4.

Mr. Cheng owns Subject Account 2 (account number ending in 8688) at Charles Schwab and the $37,905,571.53 forfeited from Subject Account 2. Declaration of Ming-Shen Cheng in Support of The Motion to Vacate Default Judgment ("Supplemental Cheng Decl.")[1] ¶ 2.

On December 23, 2024, Mr. Cheng invested $769,957.50 to purchase 5,922,750 CLEU shares and 11,845,500 CLEU warrants pursuant to a Securities Purchase Agreement with China Liberal Education Holdings, Ltd. ("CLEU"). Supplemental Cheng Decl. Exhibit 1 ("Ex. 1").

On January 14, 2025, Mr. Cheng transferred 9,278,975 CLEU shares to Subject Account 2 and deposited $11,000. Supplemental Cheng Decl. Exhibit 2 ("Ex. 2") at 4. On January 23, 2025, Mr. Cheng sold his CLEU shares. *Id.* at 4-33.

From January 24 to January 30, 2025, Mr. Cheng placed purchase orders for CLEU shares. *Id.* Some of the purchase orders were filled, some were not. Supplemental Cheng Decl. ¶ 5. In total, Mr. Cheng purchased 1,635,305 CLEU shares from the open market for $11,637,909.53 during that period. *Id.*; Ex. 2.

On January 31, 2025, Mr. Cheng noticed that his account was frozen, and he emailed[2] Charles Schwab to inquire. Supplemental Cheng Decl. Exhibit 3 ("Ex. 3") at 3. Charles Schwab responded on February 4 and asked for Mr. Cheng's account number. *Id.* Mr. Cheng provided the account number on February 6. *Id.* at 2. Hearing nothing from Charles Schwab for weeks, Mr. Cheng followed up on February 24. *Id.* On February 26, Charles Schwab responded, providing no explanation for restricting Mr. Cheng's account, and told Mr. Cheng to "reach out to Joseph M.

---

[1] Declaration of Ming-Shen Cheng in Support of The Motion to Vacate Default Judgment, originally in Chinese with certified English translation, is filed concurrently with this Motion.
[2] As Mr. Cheng does not speak English, he wrote the emails in Chinese and then used Youdao translation software to translate it to English. Supplemental Cheng Decl. ¶ 6.

Holzman at jmholzman@fbi.gov for more information." *Id.* The government never contacted Mr. Cheng before commencing this lawsuit. Supplemental Cheng Decl. ¶ 7.

### B. The Government's Civil Forfeiture Proceeding

On March 20, 2025, the government filed a verified complaint seeking to forfeit more than $37 million from Mr. Cheng's brokerage account—Subject Account 2. Dkt. 1. On March 25, 2025, the government provided notice to Mr. Cheng solely through an English-language email sent to c5757hhjju@proton.me, attaching voluminous legal documents in English. Dkt. 6-1 at 5. This email provided a deadline for filing claims but failed to explain the severe consequences of non-response or provide notice of the government's intent to seek a default decree if Mr. Cheng did not respond. This was the first time that Mr. Cheng became aware of the government's allegations against him. Supplemental Cheng Decl. ¶ 7.

Contrary to the government's assertion that Mr. Cheng "did nothing" upon receiving this email (Dkt. 14 at 1), he immediately began seeking qualified American legal representation. Cheng Decl. ¶ 5. As a foreign national with no prior experience with the U.S. legal system, Mr. Cheng faced the daunting task of identifying and engaging competent counsel from thousands of miles away. Supplemental Cheng Decl. ¶ 7.

Mr. Cheng immediately asked several friends for recommendations of U.S. legal counsel and received various referrals. Cheng Decl. ¶ 5. He also conducted his own research into potential U.S. law firms. Cheng Decl. ¶ 5. This process was naturally time-consuming given the language barriers, Mr. Cheng's unfamiliarity with the U.S. legal system, and his need to identify counsel with specific expertise in federal forfeiture matters. Supplemental Cheng Decl. ¶ 7.

On May 1, 2025, Mr. Cheng contacted Quinn Emanuel Urquhart & Sullivan LLP ("Quinn Emanuel") through an advisor to discuss potential engagement. Cheng Decl. ¶ 6. Throughout the

month of May, his advisor communicated with Quinn Emanuel on Mr. Cheng's behalf regarding the potential engagement. *Id.*

While Mr. Cheng was diligently working to secure legal representation, the government proceeded to pursue a default judgment without providing any additional notice to Mr. Cheng. On May 22, 2025, the government filed a motion for entry of a default decree of forfeiture. Dkt. 6. The government made no attempt to notify Mr. Cheng of this potentially case-terminating motion before filing it, nor did they provide him with a copy after filing.

On May 27, 2025, this Court granted the government's motion and entered a default judgment of forfeiture, ordering the forfeiture of $37,905,571.53 from Mr. Cheng's account. Dkt. 11. Again, the government made no effort to notify Mr. Cheng of this judgment.

Two days later, on May 29, undersigned counsel noticed the default judgment on the docket and immediately informed Mr. Cheng. This was the first time Mr. Cheng became aware of the default motion and the resulting judgment. Cheng Decl. ¶ 7.

Within six days of learning about the default judgment, on June 4, Mr. Cheng formally retained Quinn Emanuel as counsel in this action. *Id.* ¶ 8. The very next day, on June 5, undersigned counsel filed a notice of intent to seek relief from the default judgment. Dkt. 13.

The government filed a motion the next morning, on June 6, seeking to strike and dismiss any filings by Mr. Cheng and requesting an in-person hearing. Dkt. 14. The government noticed its motion for hearing on June 11. Dkt. 15. Mr. Cheng promptly responded. On June 9, 2025, Mr. Cheng filed a thorough opposition to the government's motion to strike, supported by a declaration addressing the government's accusations. Dkt. 17; Dkt. 19. This Court gave the government until June 25 to file its reply and stated it would set a briefing schedule on Mr. Cheng's motion to vacate the default judgment once Mr. Cheng ultimately files his motion. Dkt. 18.

The government filed its reply brief on June 13, 2025. Dkt. 22.

## LEGAL STANDARD

"The court may set aside an entry of default for good cause, and it may set aside a final default judgment under Rule 60(b)." Fed. R. Civ. P. 55(c). Rule 60(b), in turn, empowers the Court to "relieve a party … from a final judgment … [for] mistake, inadvertence, surprise, or excusable neglect" or "any other reason that justifies relief." Fed. R. Civ. P. 60(b). Courts apply a three-part test to determine whether to set aside a default judgment: (1) "good cause" for the default; (2) quick action to correct the default; and (3) the existence of a meritorious defense to the original complaint. *Sun v. Bd. of Trs. of Univ. of IL*, 473 F.3d 799, 810 (7th Cir. 2007); *see also Jones v. Phipps*, 39 F.3d 158, 162 (7th Cir. 1994). "This Circuit has a well established policy favoring a trial on the merits over a default judgment." *Sun*, 473 F.3d at 811.

## ARGUMENT

### I. GOOD CAUSE TO SET ASIDE DEFAULT JUDGMENT EXISTS.

"A party establishes good cause to vacate a default judgment by showing that 'it did not willfully ignore the pending litigation, but, rather, failed to respond to the summons and complaint through inadvertence.'" *FTC v. Construct Data Publishers*, 2014 WL 7004999, at * 5 (N.D. Ill. Dec. 11, 2014) (citing *Cracco v. Vitran Exp., Inc.*, 559 F.3d 625, 631 (7th Cir. 2009)). "Put simply, the Court must find a good reason to vacate the judgment." *Construct Data Publishers*, 2014 WL 7004999, at * 5. Courts have found good cause exists for both "excusable neglect," *Fox v. Hagene*, 2024 WL 3442979, at *1 (S.D. Ill. July 17, 2024), and where default proved too extreme a sanction. *See Sun*, 473 F.3d at 811.

**A.    Good Cause To Vacate The Default Judgment Exists Because Mr. Cheng's Failure To Respond Was Not Willful.**

Mr. Cheng has good cause to set aside the default judgment because his failure to respond was inadvertent, not willful.  Fed. R. Civ. P. 60(b)(1) ("the court may relieve a party … from a final judgment … for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect…"); *Cracco*, 559 F.3d at 631 (finding good cause where litigant "failed to respond to the summons and complaint through inadvertence").  Courts will vacate default where there is "no willful pattern of disregard for the court's orders or rules."  *Ellingsworth v. Chrysler*, 665 F.2d 180, 185 (7th Cir. 1981).  "[I]n the absence of a showing of wilfulness[sic], courts in the Seventh Circuit are more likely than not … to vacate a default judgment."  *Hamilton v. Illinois Cent. R. Co.*, 2008 WL 78784, at *4 (S.D. Ill. Jan. 7, 2008).

The record here shows no willful disregard.  Mr. Cheng, a Taiwanese citizen who has never been to the United States and who does not speak English,[3] received minimum notice from the government—only a single email to c5757hhjju@proton.me on March 25, 2025.  Dkt. 6-1 at 5. *Contra Bieganek v. Taylor*, 801 F.2d 879, 882 (7th Cir. 1986) ("In many ordinary cases resulting in default judgments, the defaulted parties were given various chances and warned; but, when they persisted in being unresponsive, they were then properly defaulted.").  While Mr. Cheng was seeking U.S. counsel, the government filed a motion for default judgment (not just entry of default) on May 22, without notifying him beforehand or afterwards.  Dkt. 6.  The government obtained

---

[3]    The government's reply in further support of its Motion to Strike extensively attacks Mr. Cheng's English proficiency in an inappropriate attempt to litigate the merits through a procedural motion.  Dkt. 22 at 21-25.  But the government ignores that business activities often involve translation assistance.  As explained in his declaration, Mr. Cheng used Youdao translation software to convert documents to Chinese for review, then translated his responses back to English. Supplemental Cheng Decl. ¶ 3.  The government's focus on collateral credibility issues reveals its strategy: avoiding merits litigation by exploiting procedural defaults.  This contradicts the Seventh Circuit's preference for resolving cases on their merits.

the default judgment on May 27, again without notice to Mr. Cheng. Dkt. 11. He learned of both the motion and judgment only when the undersigned counsel—who was not then engaged— discovered the default judgment on May 29, and immediately appeared. Cheng Decl. ¶ 7.

Mr. Cheng's delay was inadvertent, not willful. As a foreign defendant unfamiliar with the American legal system, he reasonably needed time to secure U.S. representation. Courts recognize that "it takes longer for a defendant located in a foreign country to find legal representation in the United States than a defendant in another state." *Strabala v. Zhang*, 318 F.R.D. 81, 91 (N.D. Ill. 2016); *see also CFTC v. Garofalo*, 2010 WL 11245430, at *4 (N.D. Ill. 2010) (recognizing that "retaining an attorney in a foreign country poses significant challenges" for a defendant who resides in a foreign country); *cf. Tygris Asset Fin., Inc. v. Szollas*, 2010 WL 2266432, at *3 (N.D. Ill. 2010) (holding that a defendant from Florida could not claim good cause due to the difficulty obtaining representation in Illinois). Mr. Cheng's immediate action upon learning of the default demonstrates his intent to litigate on the merits, not avoid the proceedings.

### B. Good Cause To Vacate The Default Judgment Exists Because Damages Are Disproportionate To The Wrong.

The grossly disproportionate $37 million default judgment provides additional good cause for vacatur, especially because any purported prejudice suffered by the government here is minimal. Courts in the Seventh Circuit have consistently held that "damages disproportionate to the wrong," especially multi-millions dollar awards, "afford good cause for judicial action, even though there is no good excuse for the defendant's inattention to the case." *E.g.*, *JMB Mfg., Inc. v. Child Craft, LLC*, 799 F.3d 780, 793 (7th Cir. 2015) (quoting *Sims v. EGA Prods., Inc.*, 475 F.3d 865, 868 (7th Cir. 2007));*1025 W. Addison St. Apartments Owner, LLC v. Grupo Cinemex, S.A. de C.V.*, 2021 WL 2136073, at *9 (N.D. Ill. May 26, 2021). In *Construct Data Publishers*, the court vacated a $9.1 million default judgment as disproportionate to "the minimal prejudice

suffered" by the government.  2014 WL 7004999, at *6; *see also Strabala*, 318 F.R.D. at 91 ("[D]elay that imposes slight injury does not call for multi-million-dollar awards.").  The $37 million default judgment here should give this Court "serious pause" given Mr. Cheng's inadvertent delay and minimal prejudice to the government.  *See JMB Mfg.*, 799 F.3d at 792.

Here, the government suffers only "a delay in the resolution of the case, and the costs of briefing" these motions (*Construct Data Publishers*, 2014 WL 7004999 at *6)—prejudice that does not impinge upon its "ability to pursue the litigation." *Strabala*, 318 F.R.D. at 91.  The government retains full and fair opportunity to litigate on the merits, and given "the Seventh Circuit's preference for deciding cases on the merits," this Court should grant Mr. Cheng's motion. *Id.* at 92; *see also Construct Data Publishers*, 2014 WL 7004999, at *5 ("The Seventh Circuit favors trial on the merits over default judgment.").

## II.     MR. CHENG ACTED PROMPTLY TO VACATE THE DEFAULT JUDGMENT.

### A.     Mr. Cheng Took Immediate Action To Retain Counsel And Correct The Default.

Mr. Cheng took quick action to correct the default.  "What constitutes quick action varies from case to case." *Escamilla v. United States*, 62 F.4th 367, 372 (7th Cir. 2023).  The Seventh Circuit has upheld delays of ten weeks as sufficiently prompt where no prejudice results. *Smith v. Widman Trucking & Excavating, Inc.*, 627 F.2d 792, 798 (7th Cir. 1980).

Mr. Cheng's response was exceptionally prompt.  He acted immediately upon learning of the default judgment—retaining Quinn Emanuel within six days (Cheng Decl. ¶ 8.) and filing a notice of intent to set aside the judgment the next day, only nine days after the Court's May 27, 2025 entry of judgment.  Dkt. 13.  Within fifteen days of this Court stating it would set a briefing scheduling upon the filing of a motion to vacate, the motion has been filed.

This timeline easily satisfies the "quick action" standard. Courts routinely find sufficient promptness with significantly longer delays, including four weeks in *Strabala*, 318 F.R.D. at 91, and twenty-eight days in *Construct Data Publishers*, 2014 WL 7004999, at *7. Mr. Cheng's nine-day response surpasses these benchmarks.

**B.** **Good Cause Exists For Any Delay In Mr. Cheng's Response.**

Even if the Court finds delay, good cause exists. Mr. Cheng continuously worked to secure qualified representation despite significant obstacles as a foreign national needing specialized counsel in federal civil forfeiture proceedings—a highly specialized practice area. Cheng Decl. ¶¶ 5-6; Supplemental Cheng Decl. ¶ 7; *see also* Factual Background § B.

Courts recognize that foreign defendants face unique challenges securing U.S. legal representation and that "exercising reasonable diligence in attempting to procure representation" constitutes good cause for delay, even when defendants took over four times longer than Mr. Cheng. *Allen Russell Pub., Inc. v. Levy*, 109 F.R.D. 315, 318-19 (N.D. Ill. 1985); *see also* Factual Background § B. Given the high stakes, language barriers, and need for specialized forfeiture expertise, Mr. Cheng's two-month search demonstrates the reasonable diligence that courts require.

**C.** **The Government Suffers No Cognizable Prejudice from Setting Aside the Default.**

The government's prejudice argument lacks merit and misconstrues the legal standard. The government claims that "3,000 American victims" face delayed recoveries due to Mr. Cheng's motion, Dkt. 22 at 28, but this conflates prejudice from delay with prejudice from challenging the default itself—a distinction courts consistently reject.

The Seventh Circuit has long held that any alleged prejudice must stem from the delay in filing the motion, not from the mere fact that the default judgment is being challenged. *Smith*, 627

F.2d at 798; *see also Allen Russell*, 109 F.R.D. at 319 (rejecting a prejudice claim because it addressed a consequence of challenging the default rather than a delay in filing the motion itself). The government identifies no prejudice specifically caused by Mr. Cheng's brief filing delay. The funds remain securely with the U.S. Marshals Service, no evidence has been lost, no witnesses have become unavailable, and no time-sensitive issues have arisen.

Moreover, the $37 million default judgment further undermines any prejudice claim. Courts consistently set aside "disproportionate" default judgments when weighed against "minimal prejudice" to the opposing party. *Construct Data Publishers*, 2014 WL 7004999, at *6. Accordingly, this factor also weighs in favor of vacating the default judgment.

## III.     MR. CHENG HAS MERITORIOUS DEFENSES

This Court should vacate the default judgment because Mr. Cheng has multiple meritorious defenses.[4]  While the meritorious-defense standard requires "more than bare legal conclusions," it demands "less than a definitive showing that the defense will prevail." *Parker v. Scheck Mechanical Corp.*, 772 F.3d 502, 505 (7th Cir. 2014).  "A defense is meritorious if it is good at law so as to give the factfinder some determination to make." *Bieganek*, 801 F.2d at 882; *see also Construct Data Publishers*, 2014 WL 7004999, at *7 (same).

Mr. Cheng has strong defenses to both forfeiture theories: (1) that Mr. Cheng's funds were "involved in a transaction or attempted transaction in violation of section 1957," Dkt. 6 at 4; 18 U.S.C.§ 981(a)(1)(A), and (2) that his funds were "derived from proceeds traceable to violation of 18 U.S.C. §§ 1343, 1348, 1349, or 1957," Dkt. 6 at 4; 18 U.S.C. § 981(a)(1)(C).  Because Mr. Cheng is the only person who had access to the account at issue, both theories require, in effect, proving that he participated in the wire fraud or securities fraud offenses alleged by the

---

[4]  Mr. Cheng's enumeration of potential meritorious defenses herein is not exhaustive and shall not be construed as a waiver of any rights or defenses.

government.  If he did not commit these predicate offenses, his trading profits cannot be "involved in" or "traceable to" criminal violations.  Because the government has put forth no allegations that would establish either predicate charge against Mr. Cheng, and has not explained how the trading proceeds in Mr. Cheng's account are proceeds of any such offense, its forfeiture theory fails.

Relatedly, Mr. Cheng has an innocence defense under 18 U.S.C. § 983(d)(2)(A).  Even a "hint of a suggestion" of innocence suffices to show a meritorious defense for setting aside default. *United States v. $22,050.00 U.S. Currency*, 595 F.3d 138, 326 (6th Cir. 2010).  Mr. Cheng's defense is far stronger—he does not even know any of the alleged scheme participants or co-defendants in the criminal proceeding, let alone their alleged criminal activities, and the government has not alleged otherwise.  Supplemental Cheng Decl. ¶ 8.  These facts easily establish the innocence defense.

## A.    Mr. Cheng Has Meritorious Defenses To Wire Fraud Charge.

The government cannot demonstrate that Mr. Cheng's funds are either "involved in" or "obtained … as the result of the commission of" the alleged wire fraud, because Mr. Cheng has meritorious defenses to the government's wire fraud charge.

To establish wire fraud, the government must prove that Mr. Cheng "(1) participated in a scheme to defraud; (2) intended to defraud; and (3) caused an interstate wire to be used in furtherance of the scheme." *United States v. Gustafson*, 130 F.4th 608, 614 (7th Cir. 2025).  The government has not and cannot establish the first or second elements.

### 1.    Scheme to Defraud

The government cannot establish Mr. Cheng's funds derived from a "scheme to defraud" because it has put forth no evidence that he participated in making any of the false or misleading statements alleged in the complaint.  "To prove a scheme to defraud, the government must show

that [the defendant] made a material false statement, misrepresentation, or promise, or concealed a material fact." *United States v. Weimert*, 819 F.3d 351, 355 (7th Cir. 2016).

(a)       Material Misrepresentations

Although the complaint does not state with precision which aspects of the alleged conduct the government regards as fraudulent, the government appears to rely on four categories of allegedly false or misleading statements: (1) statements from alleged "investment advisors" claiming to be U.S.-based and encouraging investors to invest in CLEU stock, Dkt. 1 at ¶¶ 23-33; (2) CLEU's failure to disclose in a timely fashion the number of outstanding shares, Dkt. 1 at ¶¶ 49-50; (3) misrepresentations made to the broker regarding the affiliation of several accounts, none of which belonged to Mr. Cheng, Dkt. 1 at ¶¶ 41-43; and (4) spoofing, Dkt. 1 at ¶ 20.

The government does not allege, and the proof will not show, that Mr. Cheng knew about any of these statements or omissions or had any role in causing them. Moreover, the complaint does not establish that any of them would be material to a reasonable investor. Materiality requires "a tendency to influence, or [be] capable of influencing" the decision maker. *Neder v. United States*, 527 U.S. 1, 16 (1999) (citation omitted). To be material, a statement must "significantly alter the total mix of information available to the investor." *Acme Propane, Inc. v. Tenexco, Inc.*, 844 F.2d 1317, 1322 (7th Cir. 1988). The alleged misrepresentations fail this standard entirely.

***First***, the government does not allege that Mr. Cheng himself recommended that anyone purchase CLEU stock. Rather, the alleged statements were all made by "Individual C," "Individual D," and "Individual E." Dkt. 1 at ¶¶ 25-32. Nor does the government allege that Mr. Cheng encouraged or even knew about these statements. Even if the government could establish such a connection, many of the statements described in the complaint are not false or misleading. Standing alone, it is not a crime to encourage others to buy stock. Moreover, even as to those assertions that the government alleges are false—such as the claim that certain individuals were in

13

the United States—there is no allegation that the false statements would have been material to a reasonable investor. *See Acme Propane*, 844 F.2d at 1322. Mr. Cheng therefore cannot be found to have engaged in wire fraud based on those statements. *See United States v. Schwartz*, 2024 WL 3226575, at *2 (N.D. Ill. June 28, 2024) (wire fraud requires knowing participation in fraudulent conduct).

**Second**, CLEU's failure to disclose the outstanding number of shares cannot be attributed to Mr. Cheng. Dkt. 1 at ¶¶ 49-50. This omission was by the company, not any individual traders. Mr. Cheng cannot be culpable for corporate disclosures he did not make or control.

**Third**, the government cites statements made by Chieng Lung Ma, Siong Wee Vun, and Kok Wah Wong that they were "not connected to any other owner of CLEU shares." *Id.* ¶ 42. Again, these statements are not made by Mr. Cheng and cannot be attributed to him. And of course, Mr. Cheng cannot be culpable for statements made by co-defendants he does not know. Nor are these statements material. Where courts have found material misrepresentations, the government alleged significantly more than the barebones allegations here. *See United States v. Coffman*, 94 F.3d 330, 332-334 (7th Cir. 1996) (finding material misstatements where defendant told investors he had reaped rewards from specific fund and had history managing such funds). A statement from Mr. Cheng's unknown co-defendants that they do not know others in the alleged scheme lacks any hallmarks that might influence a reasonable investor.

**Fourth**, the spoofing conduct alleged by the government cannot support its forfeiture case for multiple reasons. At the most basic level, the funds at issue were not involved in any spoofing conduct. They were trading profits Mr. Cheng earned **before** any alleged spoofing conduct. These funds therefore cannot be "involved in" or "traceable to" alleged spoofing conduct that occurred

afterward.  *See M&N Trading, LLC v. Bank of Am. Securities, Inc.*, 2024 WL 4651857, at *4 (N.D. Ill. Nov. 1, 2024) (spoofing must occur in tandem with the trading).

Moreover, the complaint contains no allegations that would support the inference that Mr. Cheng engaged in spoofing.  Spoofing requires placing bid "*with the intent* to cancel the bid or offer before execution."  7 U.S.C. § 6c(a)(5)(C) (emphasis added).  There are no allegations in the complaint to support the claim that Mr. Cheng placed any orders with the intent to cancel them. To the contrary, from January 24-30, 2025, Mr. Cheng placed purchase orders for CLEU shares with legitimate commercial purposes.  Some orders were filled, others were not.  In total, he purchased 1,635,305 CLEU shares for $11,637,909.53 during this period.  Supplemental Cheng Decl. ¶ 5.  These were genuine, executable orders placed with price limits.  When prices rose above his limits, the orders were cancelled for sound commercial reasons—not to manipulate markets. "Where a trader acts with a legitimate investment or commercial purpose, no manipulative intent can be found."  *Transnor (Bermuda) Lt. v. BP N. Am. Petroleum*, 738 F. Supp. 1472, 1495 (S.D.N.Y. 1990).  Because Mr. Cheng did not place orders with intent to cancel, he did not engage in spoofing, and his conduct cannot form the basis of a wire fraud claim.

(b)      Knowing Participation

Finally, the government has put forth no evidence that Mr. Cheng knowingly devised or willingly participated in any scheme to defraud.  *Schwartz*, 2024 WL 3226575, at *2 ("A wire fraud conviction requires the Government to prove that … the defendant knowingly devised or participated in a scheme or plan to defraud.").  The government has not offered—indeed it cannot offer—any evidence that Mr. Cheng knew or knows any of the other owners of the seized funds or that he knew the individuals purporting to be investment advisors.  Supplemental Cheng Decl. ¶ 8.  Simply put, Mr. Cheng was not involved in any scheme to defraud.  If he is relieved of

15

the default and permitted to challenge the government's allegations on the merits, the evidence will show precisely that.

### 2.    Intent to Defraud

Finally, the government fails to allege that Mr. Cheng acted with "intent to defraud"—that is, the intent to deceive *and* cheat others of their money or property.  Wire fraud requires a specific intent to defraud, meaning an intent to (1) deceive *and* (2) cause some harm to result from the deceit.  *United States v. Chanu*, 40 F.4th 528, 542–43 (7th Cir. 2022) (noting that for intent to defraud "[y]ou need deception, and you need an intent to cause loss of money or property, *i.e.*, intent to harm"); *United States v. Schampers*, 2023 WL 3001896, at *1 (E.D. Wis. Apr. 19, 2023) ("Intent to defraud requires that the alleged deceit be for the purpose of obtaining money or property by means of those deceptions … [T]here must be an intent to both 'deceive and cheat.'") (citation omitted); *see also United States v. Miller*, 953 F.3d 1095, 1103 (9th Cir. 2020) ("wire fraud requires the intent to deceive *and* cheat") (emphasis in original); *United States v. Greenlaw*, 84 F.4th 325, 350-1 (5th Cir. 2023) (same).

The government alleges no such intent.  Its allegations—as it relates to Mr. Cheng— amount to (1) his account sold CLEU shares and (2) his account placed orders that were later cancelled (Dkt. 1 ¶¶ 36-40).  Simply selling shares cannot demonstrate intent to deceive and cause harm.  The government offers no factual allegations that Mr. Cheng intended his trading to cheat, harm, or deprive any counterparty of money or property.

Even as to the alleged spoofing, which as noted cannot be connected to the seized funds, the government has not made any factual allegations that would plausibly suggest that Mr. Cheng placed order with intent to deceive.  The alleged spoof orders were objectively valid offers that anyone could have accepted before cancellation.  Importantly, Mr. Cheng actually executed many of these orders, purchasing 1,635,305 CLEU shares for $11,637,909.53, demonstrating genuine

investment intent rather than manipulative purpose.  Supplemental Cheng Decl. ¶ 5.  The fact that some of these orders were canceled is not sufficient to convert this objectively lawful conduct into criminal fraud absent some evidence that Mr. Cheng placed these trades while "obscuring [his] intent to cancel them." *Chanu*, 40 F.4th at 541.

**B.     The Securities Fraud Claims Fail.**

The government fares no better when basing its forfeiture allegations on alleged securities fraud.  Securities fraud requires (1) fraudulent intent; (2) a scheme or artifice to defraud; and (3) a nexus with a security. *United States v. Coscia*, 866 F.3d 782, 796 (7th Cir. 2017).  The government can establish only the security nexus element.

First, the government has not and cannot establish a fraudulent intent.  As with wire fraud, the government fails to allege that Mr. Cheng acted with intent to deceive or cause harm. *Chanu*, 40 F.4th at 542-43; *see also Miller*, 953 F.3d at 1103; *United States v. Armbruster*, 2021 WL 5206581, at *3 (E.D. Wis. Nov. 8, 2021) ("To sustain the charge of securities fraud… the government was required to establish… the intent to deceive and cheat…").

Second, the government cannot establish that Mr. Cheng participated in a scheme to defraud.  "[A] scheme to defraud" "has the same meaning across wire fraud, bank fraud, and commodities-fraud statutes." *United States v. Smith*, 555 F. Supp. 3d 563, 573 (N.D. Ill. 2021) (citing 18 U.S.C. §§ 1343, 1344(1), 1348(1)).  Since the government cannot establish the "scheme to defraud" element for wire fraud, *see supra,* Argument § III(A)(1), it cannot do so here.

The government's securities fraud theory therefore fails because it can establish at most one of three required elements.

**C.     Mr. Cheng Has An Innocent Owner Defense.**

Finally, in addition to the deficiencies in the government's affirmative case, Mr. Cheng also has a meritorious claim that he is an innocent owner of the assets at issue.  The civil forfeiture

statute protects "innocent owner[s]" whose "interest in property shall not be forfeited under any civil forfeiture statute." 18 U.S.C. § 983(d). Section 983(d)(2)(A) provides an innocent owner defense to a claimant who (1) held interest in the property at the time of the illegal conduct, and (2) "did not know of the conduct giving rise to forfeiture." *See United States v. All Funds on Deposit with R.J. O'Brien & Assocs.*, 783 F.3d 607, 619 (7th Cir. 2015).

Mr. Cheng satisfies both elements. He owns the property in Subject Account 2. Supplemental Cheng Decl. ¶ 2. And he does not know any of the participants in the alleged fraudulent scheme and was not aware of their alleged criminal conduct. *Id.* ¶ 8.

Even if other parties engaged in an illegal "pump and dump" scheme, Mr. Cheng cannot be liable and his funds cannot be traceable to or be involved in the offense without his knowledge or participation. Property qualifies as "proceeds" of an illegal offense only if the individual alleged to have committed the offense has knowledge of the underlying offense—otherwise no offense has been committed by that individual. *See United States v. Yass*, 636 F. Supp. 2d 1177, 1183-84 (D. Kan. 2009) (determining that "proceeds" means "property of any kind obtained directly or indirectly, as a result *of the commission of the offense*") (emphasis added) (citation omitted). Similarly, property "involved" in a transaction under § 981(a)(1)(A) should not be forfeited where "the claimant satisfies the 'innocent owner' defense." *United States v. $448,342.85*, 969 F.2d 474, 476 (7th Cir. 1992). It would be nonsensical to forfeit profits from someone who happened to trade at the time during an illegal scheme about which he knew nothing. Without knowledge, there can be no culpability. *See United States v. Beaman*, 128 F. Supp. 2d 1188, 1193 (N.D. Ind. 2001) (concluding that without knowledge of an illegal scheme, a convicted defendant did not qualify for a sentence enhancement). Mr. Cheng's trading profits from legitimate market transactions

cannot constitute "proceeds" of or property "involved in" criminal conduct he neither knew about nor participated in.

## CONCLUSION

For the foregoing reasons and authorities, Mr. Cheng respectfully requests the Court to enter an order vacating the entry of default judgment against Subject Account 2.

Date: June 25, 2025                                        Respectfully submitted,


By: /s/ *Tyler C. Murray*
　　Tyler C. Murray
　　QUINN EMANUEL
　　URQUHART & SULLIVAN, LLP
　　191 N. Wacker Drive, Suite 2700
　　Chicago, Illinois 60606
　　(312) 705–7400
　　tylermurray@quinnemanuel.com

　　Scott A. Hartman (pro hac vice pending)
　　Jianjian Ye (pro hac vice pending)
　　QUINN EMANUEL
　　URQUHART & SULLIVAN, LLP
　　295 Fifth Avenue
　　New York, NY 10016
　　(212) 849–7000
　　scotthartman@quinnemanuel.com
　　jianjianye@quinnemanuel.com

　　***Counsel for Claimant Ming-Shen Cheng***