UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>FUNDS IN THE AMOUNT OF $37,905,571.53 SEIZED FROM COMPANY A ACCOUNT NUMBER XXXX8688 HELD IN THE NAME OF MING-SHEN CHENG | No. 25 C 2965<br><br>Judge Jorge L. Alonso |

**GOVERNMENT'S RESPONSE TO CLAIMANT'S**
**MOTION TO VACATE DEFAULT JUDGMENT**

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ iii

BACKGROUND ........ 5

LEGAL STANDARD ........ 14

ARGUMENT ........ 15

I. The Fugitive Disentitlement Statute – 28 U.S.C. §2466 – Precludes Cheng's Ability to Seek Vacatur of the Default Judgment ........ 16

II. Cheng Failed to Carry His Burden Showing Good Cause for His Delay ........ 16

III. Cheng Failed to Carry His Burden Showing Quick Action on His Part ........ 21

IV. Cheng Has Failed to Carry His Burden Showing That He Is Meritorious Defense to The Civil Forfeiture Complaint ........ 22

A. Wire Fraud and Securities Fraud ........ 23

B. The Civil Forfeiture Complaint Alleges Cheng's Culpability for both Wire Fraud and Securities Fraud ........ 25

C. Cheng Is Not and Innocent Owner of the Seized Funds ........ 30

CONCLUSION ........ 32

# TABLE OF AUTHORITIES

Cases Page(s)

10 C 2417 2010 WL 11245430 (N.D. Ill. Dec. 21, 2010) .................................... 20, 21

19 C 1533 2021 WL 4949216 (S.D. Ind. Jan. 20, 2021) ............................................ 22

*Arwa Chiropractic, P.C. v. Med-Care Diabetic & Medical Supplies, Inc.* 961 F.3d 942 (7th Cir. 2020) ............................................................................................ 15

*C.KS. Eng'rs, Inc. v. White Mountain Gypsum Co.* 726 F.2d 1202 (7th Cir. 1984)... 17

*Coscia* 866 F.3d ........................................................................................................ 25

*Cracco v. Vitran Express, Inc.* 559 F.3d 625 (7th Cir. 2009) .................................... 15

*Inquote Corp. v. Cole*, No. 99 C 6232, 2002 WL 483417 (N.D. Ill. Mar. 29, 2002) .... 19

*Jones v. Phipps* 39 F.3d 158 (7th Cir. 1994) ................................................. 16, 21, 23

*Lyons Partnership, L.P. v. Welle*, No. 08 C 2909, 2010 WL 680877 (N.D. Ill. Feb. 22, 2010) ............................................................................................................... 19

*McCormick v. City of Chicago* 230 F.3d 319 (7th Cir. 2000) .................................... 15

*Merrill Lynch Mort. Corp. v. Narayan* 908 F.2d 246 (7th Cir. 1990) ....................... 15

*Pretzel & Stouffer, Ctd. v. Imperial Adjusters, Inc.* 28 F.3d 42 (7th Cir. 1994) ........ 23

*Stafford v. Mesnik* 63 F.3d 1445 (7th Cir. 1995) ...................................................... 16

*Strabala v. Zhang* 318 F.R.D. 81 (N.D. Ill. 2016) ..................................................... 20

*Sullivan v. Gen. Plumbing, Inc.* No. 06 C 2464, 2007 WL 1030236 (N.D. Ill. Mar. 31, 2007) ............................................................................................................... 22

*U.S. Currency* 730 F.3d 1051 (9th Cir. 2013) ........................................................... 16

*United States v. Chanu* 40 F.4th 528 (7th Cir. 2022) ............................................... 25

*United States v. Coscia* 886 F.3d 782 (7th Cir. 2017) ............................................... 25

*United States v. DiMucci* 879 F.2d 1488 (7th Cir. 1989) .......... 17

*United States v. Ginsberg* 971 F.3d 689 (7th Cir. 2020) .......... 25

*United States v. Higgins* 270 F.3d 1070 (7th Cir. 2001) .......... 25

*United States v. Jackson* 546 F.3d 801 (7th Cir. 2008) .......... 25

*United States v. Krishnan* 469 F. Supp. 3d 481 (E.D.N.C. 2020) .......... 17

*United States v. Leahy* 464 F.3d 773 (7th Cir. 2006) .......... 24

*United States v. Offill* 666 F.3d 168 (4th Cir. 2011) .......... 25

*United States v. Pacilio* 85 F.4th 450 (7th Cir. 2023) .......... 25

*United States v. Powell* 576 F.3d 482 (7th Cir. 2009) .......... 23

*United States v. Ross* 77 F.3d 1525 (7th Cir. 1996) .......... 24

*United States v. Stephens* 421 F.3d 503 (7th Cir. 2005) .......... 24

*United States v. Weimert* 818 F.3d 351 (7th Cir. 2016) .......... 24

*Zuelzke v. Tool & Eng'g Co. v. Anderson Die Castings, Inc.* 925 F.2d 226 (7th Cir. 1991) .......... 15

Statutes

18 U.S.C. § 983(d)(B)(i)(I) .......... 31

18 U.S.C. § 1348(1) .......... 25

18 U.S.C. §§ 983(d)(1) .......... 31

18 U.S.C. §§ 1343 .......... 23, 25

28 U.S.C. § 2466 .......... 6, 8, 16

U.S.C. §§ 1343 and 1348(1) .......... 25

Other Authorities

09 C 4488 2010 WL 26100652 (N.D. Ill. June 21, 2010) .......... 19

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, hereby submits this response in opposition to Claimant Ming-Shen Cheng's Motion to Vacate the Default Judgment ("Motion' or "Mot." (Dkt. 26)). Cheng's Motion mentions nowhere that he is under indictment in this Court for the very same conduct alleged in this matter and that he remains a fugitive from justice. For that reason alone, Cheng is disentitled under 28 U.S.C. § 2466 from seeking any relief here. And, even if the Court were to decide this Motion despite Cheng's fugitive status, he still fails on the merits because Cheng waited until after the default judgment was entered to seek relief and he cannot otherwise establish good cause, speedy action, or a meritorious defense. Cheng seeks extraordinary relief from this Court: he asks the Court to allow a known fugitive to set aside a default judgment in a civil case directly related to the criminal case and to keep money from going back to approximately 3,000 American victims he stole from. Cheng's Motion should be denied.

**BACKGROUND**

The government has been investigating for the past year foreign influence over the American stock market by individuals located overseas, including Cheng. In particular, the government's investigation has focused on foreign corporations whose stock trades on U.S. based exchanges like Nasdaq. The government has uncovered instances of the stock of these foreign issuers being used in pump and dump schemes

to dupe American investors into purchasing worthless stock prior to that stock's price crashing. The government's investigation revealed that while American retail investors lost substantial amounts of money, individuals overseas like Cheng made enormous sums of money trading the same stock. Cheng and his co-schemers had one critical advantage over their American victims: they controlled so much of the stock of these foreign issuers that they could manipulate the market causing artificial increases in the stock's price.

The government's investigation further revealed that these overseas individuals, including Cheng—have worked with individuals in China who stole and assumed the identities of American investment advisers, lawyers, and former government officials to target victims in the United States on social media platforms, promising them exorbitant returns if they purchased stock in the foreign issuer. The American victims clicked on a link via a social media platform, which directed them to the imposter located in China who pitched the American victims on Chinese based stocks traded on American exchanges. The American victims—believing that they were speaking and corresponding with legitimate investment advisers based in the United States—purchased the stock of the foreign company. Once the complicit foreign traders—like Cheng—unloaded their positions, the stock price crashed, and the American investors lost almost the entirety of their investments. This insidious pattern continued with multiple foreign companies throughout 2024.

In early 2025, Cheng and his co-schemers coordinated one such pump and dump scheme that targeted American investors using a Chinese issuer—China Liberal Education Holdings ("CLEU")—whose stock traded on the Nasdaq stock exchange in the United States. Dkt. 1, ¶¶ 11-12. CLEU was a holding company incorporated in the Cayman Islands that, according to its filings with the United States Securities and Exchange Commission ("SEC"), operated in China with the ostensible business purpose of providing "China's students with the tools to excel in a global environment." *Id*. CLEU was not a profitable company: it reported net losses in the millions of dollars between 2021 through 2024. *Id*. at ¶ 13. By the summer of 2024, CLEU's stock was an almost worthless penny stock trading at below $1 per share. *Id*. at ¶¶ 14-15. Nasdaq notified CLEU that it would be delisted from the exchange because of its stock value. *Id*.

By December 23, 2024, CLEU had 483,816,663 outstanding shares and its stock price was approximately $0.162 per share. Dkt. 1, ¶ 16. The next day—December 24, 2024, CLEU executed a share consolidation to keep it from being delisted from Nasdaq. Through this share consolidation, every 15 outstanding shares of CLEU stock was combined into one share, thereby reducing the total amount of outstanding shares to approximately 29,254,444 and increasing the average value of one share to above $1. Dkt. 1, ¶ 17.

The same day that CLEU announced its stock consolidation, Cheng opened a brokerage account with Company A—an American brokerage company. Cheng

needed to use an American brokerage account to trade CLEU stock on Nasdaq. In other words—despite not knowing how to read English without translation assistance (Dkt. 26-2), Cheng opened a brokerage account in the United States for the purpose of trading stock on the American stock market. Immediately after CLEU publicly announced that there were only approximately 29 million shares of outstanding stock, CLEU transferred 240 million CLEU shares directly to Cheng and his co-schemers. Dkt. 1, ¶ 18. CLEU, however, did not make any public disclosure of this secret transfer of shares until January 27, 2025. *Id.*

On January 6, 2025, Cheng filled out Company A paperwork—that was in English—seeking to transfer equities to his recently opened Company A brokerage account:

Important Disclosures Regarding Account Discrepancies

Name Discrepancies: All account holders or authorized signers of the account(s) listed in Sections 1 and 2 of this form must sign below. If an account holder's name appears differently on either account, the owner must sign the form using all name variations (e.g., maiden name and married name). If there is a name variation, may require additional documentation before accepting the account, such as a marriage certificate or a divorce decree.

Registration Discrepancies: By signing below, I/we acknowledge the existence of any differences in account owners and/or account type between the account being transferred into and the account. Each individual who signs below is aware of these discrepancies and authorizes to accept the transfer of assets as indicated on this form. or the delivering firm may require additional documentation to effect transfers of assets between unlike accounts.

By signing below, I/we acknowledge that I/we have read and I/we understand this form in its entirety. I/we hereby authorize the transfer of my/our account as listed in Section 2 to the account listed in Section 1. By signing below, I/we also authorize any name or account discrepancy during the transfer.

Sign and date using blue or black ink.

Please note that a Full Power of Attorney is not authorized to sign this form.

All account holders must have their signatures notarized.

X 鄭明坤 01-06-2025

Account Holder/Trustee Signature Today's Date (mm/dd/yyyy)

MING-SHEN CHENG

Print Name

Exhibit A. That same day, Cheng sent an email to Company A:

To: secure_international
From: c5757hhjju@proton.me
Date Sent: 2025-01-06T07:48:42
Subject: Transfer your Account to

*I have submitted the transfer form and account statement to initiate the process of transferring my account to Please assist with the processing. Should you have any questions, feel free to contact me at any time. Thank you!*

Exhibit B.

On January 14, 2025, Cheng deposited approximately 9,278,925 shares into his Company A brokerage account that he received directly from CLEU. *United States v. Cheng*, No. 25 CR 161-2 (N.D. Ill.), Dkt. 1, ¶ 6. The cost to Cheng was approximately $.60 a share. While Cheng received these clandestine CLEU shares directly from the issuer, his co-schemers were using a WhatsApp messaging system to pitch American retail investors on CLEU. Dkt. 1, at ¶¶ 23-33.

Cheng's co-schemers stole the identities of American investment advisers and lured American retail investors into a massive pump and dump of CLEU stock that they were planning—with Cheng's help. *See id*. The WhatsApp impersonators pitched these unsuspecting American retail investors on CLEU by promising significant profits, and in doing so, created more demand for CLEU stock—which was publicly reported to only consist of approximately 29 million shares at the time even though Cheng and his co-schemers had received approximately 240 million undisclosed shares directly from CLEU. *Id*. at ¶¶ 18-19, 23-33.

On January 16, 2025, Cheng communicated with Company A via email in English: "As for my position has been successfully transferred to my [Company A] account. I am very appreciate with high efficient of [Company A]. After a hold these positions for a period. I am planning to sell it. Before I sell it I want to confirm, Does any sell restriction my account." Exhibit C.

After confirming that he could sell his CLEU shares (i.e., there was no Company A restriction), Cheng waited for his WhatsApp imposter co-schemers to target enough American retail investors to drive up the CLEU stock price. When they did, Cheng pounced: on January 22, 2025, he sold all 9,188,500 shares of his secret CLEU stock and made approximately $49,535,081.17. Dkt. 1, ¶ 39. Cheng's six co-defendants also pounced at the same time selling approximately 42 million shares of CLEU stock. *See* Dkt. 1, ¶¶ 39, 45-47. Cheng's co-defendants were in Malaysia and Taiwan, and his uncharged co-schemers were in China. *See Cheng*, No. 25 CR 161-2, Dkt. 1, ¶1(a)-(j); Dkt. 1, ¶ 19.

Cheng also coordinated his fraudulent trades matching his sell orders with the prices that his co-schemers were telling innocent American victims to purchase CLEU stock at; in other words, Cheng's sell prices matched the buy prices that his co-schemers pitched to unwitting American investors. Cheng's fraud made the market for worthless and secret CLEU shares facilitating this widespread fraud.

Company A flagged Cheng's brokerage account for suspicious trading the following day and prohibited Cheng from using his brokerage account to sell any

additional shares. *Id*. at ¶ 38. Still, to drive up CLEU's stock price even more, Cheng and three of his co-schemers continued to use their Company A brokerage accounts to try to artificially pump up the price of CLEU stock. *Id*. at ¶ 40. They did so by entering and quickly canceling buy orders for CLEU stock. *Id*. Cheng's co-schemers were still lying to American retail investors at the same time and were also still unloading CLEU shares—so Cheng's complicity in the scheme continued even after he unloaded his CLEU shares. *See id*.

On January 30, 2025, the market reacted to CLEU's January 27, 2025 SEC public filing disclosing that CLEU transferred shares to Cheng and his co-schemers. *Id*. at ¶ 50. As a result, the price of CLEU stock crashed causing thousands of American retail investors to lose almost the entirety of their investment in CLEU stock. *See id*. On January 30, 2025, Company A notified Cheng that it was closing his account. *See* Exhibit D. The following day, on January 31, 2025, Cheng emailed Company A—again in English—stating that "I want to withdraw the money in my account and transfer my positions, but now I find that my account is restricted. Please help me find out what caused the restriction and when my account can work normally." *See* Exhibit E. A representative from Company A emailed Cheng on February 4, 2025 asking for his account information, and Cheng responded—again in English:

Hello Deanna

My account No, 24028688, Owing to current situation. I want to transfer my position and cash to another brokerage account under my name,

please proceed my transfer .

Cheng

*Id.* Several weeks later, Cheng emailed Company A again:

**From:** c5757hhjju@proton.me
**To:** Restricted Stock
**Subject:** RE: About account be restriced
**Date:** Monday, February 24, 2025 1:56:39 PM

Hello

When can release my account ? If my account still not be release . I want to move my position to my another brokerage account , Please let me know what I can do now?

Cheng

*Id.* Again, although he now claims not to speak, read, or write English without translation assistance (Dkt. 26-2), Cheng had no issues communicating with Company A.

Law enforcement seized Cheng's Company A stock on February 12, 2025. Dkt. 1, at ¶¶ 4, 5. On March 20, 2025, Cheng was publicly indicted on charges of securities fraud and wire fraud for his role in the scheme. *See Cheng*, N25 CR 161-2. If convicted in the criminal case, the advisory sentencing guidelines call for a sentencing range of 360 months' to life imprisonment, though Cheng faces a statutory maximum combined term of imprisonment of 45 years.

Cheng was also indicted with six other traders who received secret CLEU shares from the issuer and then used brokerage accounts at Company A and Company B to sell these shares while American retail investors were being duped by WhatsApp imposters to purchase the shares. *See Cheng*, 25 CR, Dkt. 1. The government also seized cash and equities from these six traders in the present matter. As for Cheng, an arrest warrant was issued on March 20, 2025 for Cheng and his co-defendants. Since Cheng has never appeared to face the charges, he is a fugitive. The same day as the arrest warrant, the government filed a verified complaint for forfeiture against funds seized from Cheng and certain of his co-schemers. Dkt. 1. The government emailed a copy of the verified complaint to Cheng at the same email address that he used to correspond with Company A representatives and advised Cheng of the proceeding and the requirement that he timely file a claim. Dkt. 6-1. He never did so.

On May 22, 2025, the government filed a Motion for Entry of a Default Decree of Forfeiture, and noticed the motion for May 27, 2025. Dkt. 6, 7. On May 27, 2025, the Court held a telephonic motion hearing and granted the Motion for Entry of a Default Decree of Forfeiture. Dkts. 9, 11. The Court entered the default decree of forfeiture. Dkt. 11. Late on June 5, 2025, Cheng filed a notice of intent to file a motion seeking to vacate the default judgment. Dkt. 13. The notice was barebones and contained no support for why such relief was warranted. *Id.* The following day, June 6, 2025, the government filed a Motion to Strike and Dismiss any Filings by Claimant

Ming-Shen Cheng. Dkt. 14. Cheng responded three days later, and that motion is now fully briefed. Dkts. 17, 22. Cheng, however, waited until June 25, 2025 to file his Motion, Dkts. 26, 29 days after the Court entered the default judgment.

**LEGAL STANDARD**

"Rule 55(c) [of the Federal Rules of Civil Procedure] states '[f]or good cause shown the court may set aside an entry of default and, if a judgment by default has been entered, may likewise set it aside in accordance with Rule 60(b).'" *Merrill Lynch Mort. Corp. v. Narayan*, 908 F.2d 246, 252 (7th Cir. 1990) (quoting Fed. R. Civ. P. 55(c)). Rule 60(b) permits relief from a final judgment for "mistake, inadvertence, surprise, or excusable neglect" or "any other reason that justifies relief." Fed. R. Civ. 60(b). The elements for relief under Rules 55(c) and 60(b) are substantially the same, but the standards are more stringent in the Rule 60(b) context. *Cracco v. Vitran Express, Inc.*, 559 F.3d 625, 630 (7th Cir. 2009). Relief under Rule 60(b) is "an extraordinary remedy and is granted only in exceptional circumstances." *McCormick v. City of Chicago*, 230 F.3d 319, 327 (7th Cir. 2000).

To obtain relief under either rule, the defendant bears the burden to show each of the following three elements: "(1) good cause for its default; (2) quick action to correct it; and (3) a meritorious defense to the plaintiff's complaint." *Arwa Chiropractic, P.C. v. Med-Care Diabetic & Medical Supplies, Inc.*, 961 F.3d 942, 949 (7th Cir. 2020) (cleaned up); *see also Zuelzke v. Tool & Eng'g Co. v. Anderson Die Castings, Inc.*, 925 F.2d 226, 230 (7th Cir. 1991) ("[W]e need not pause long on the

issue of a meritorious defense. Even if one exists, standing alone, it cannot excuse carelessness."). This test "establishes a high hurdle for parties seeking to avoid default judgments and requires something more compelling than ordinary lapses of diligence or simple neglect to justify disturbing a default judgment." *Jones v. Phipps*, 39 F.3d 158, 162 (7th Cir. 1994). While the Seventh Circuit has recognized the principal of favoring a trial on the merits over a default judgment, it does not necessarily "disfavor[] default judgments." *Stafford v. Mesnik*, 63 F.3d 1445, 1450 (7th Cir. 1995).

## ARGUMENT

Cheng's Motion should be denied because (1) his fugitive status bars him from litigating this civil forfeiture case directly related to his criminal case from abroad; (2) he failed to show good cause for moving to vacate the default judgment; (3) he failed to take quick action to vacate the default judgment; and (4) he has no meritorious defense to the civil forfeiture complaint.

### I. The Fugitive Disentitlement Statute—28 U.S.C. § 2466—Precludes Cheng's Ability to Seek Vacatur of the Default Judgment

As provided in the government's briefing, *see* Dkt. 14, 22, the fugitive disentitlement statute—codified in 28 U.S.C. § 2466—precludes Cheng from litigating before this Court. And the Court can decide that issue as a threshold matter without delving into Cheng's Motion. *See United States v. $671,160 in U.S. Currency*, 730 F.3d 1051, 1059 (9th Cir. 2013) (because invocation of the fugitive disentitlement doctrine means claimant cannot litigate any issue, district court correctly declined to

consider claimant's motion to suppress before granting the government's motion to strike); *United States v. Krishnan*, 469 F. Supp. 3d 481, 487 (E.D.N.C. 2020) (fugitive disentitlement is a "threshold issue" that the court addressed before addressing the claimant's motion to stay).

## II. Cheng Failed to Carry His Burden Showing Good Cause for His Delay

Cheng has not shown good cause for his delay in bringing a motion to vacate the default judgment. Good cause weighs the equities to both sides and the Court should consider the default party's actions and the prejudice to each side. *See United States v. DiMucci*, 879 F.2d 1488, 1495 (7th Cir. 1989). Good faith is found with an honest mistake—not with willful misconduct, carelessness, or negligence. *See C.KS. Eng'rs, Inc. v. White Mountain Gypsum Co.*, 726 F.2d 1202, 1205 (7th Cir. 1984).

At the outset, Cheng's Motion ignores the elephant in the room: he knows that he is a wanted fugitive in a criminal case directly related to this matter. His willful failure to self-surrender to the United States' authorities while trying to litigate this case is bad faith. Additionally, none of the cases that he cites deal with a known fugitive who fails to appear in a related criminal case, waits until after the entry of a default judgment, and then seeks court relief seeking vacatur of that judgment. Further, none of Cheng's cited cases have actual victims; conversely, there are approximately 3,000 American retail investors who lost money (including retirement savings) because of Cheng's scheme. Cheng's actions here have delayed these victims receiving their money back.

Moreover, Cheng has known that Company A froze his account since late January 2025. Cheng then spent the month of February 2025 communicating with Company A representatives trying to find out information about why his account was frozen. In early March 2025, Company A advised Cheng that he should contact an FBI special agent. Cheng never did so. Then, on March 20, 2025, Cheng was indicted along with six co-defendants and the government also filed the present case seeking civil forfeiture. On March 25, 2025, the government emailed a copy of the complaint to Cheng (at the same email address he used to correspond with Company A) advising him of the deadline in which to file a claim including a copy of the civil forfeiture complaint:

**From:** Ryan, Mary (USAILN) [Contractor]
**To:** c5757hhjju@proton.me
**Cc:** Hasten, Jared (USAILN)
**Subject:** US v. Funds in the amount of $19,901,190.49 seized from Company B account number xxxx9087, et al. 25-cv-2965, Direct Notice
**Date:** Tuesday, March 25, 2025 4:14:00 PM
**Attachments:** Cheng Direct Notice Cover Letter with Notice of Forfeiture Action.pdf
Verified Civil Complaint 25-cv-2965.pdf
filed_civil cover sheet.pdf
Arrest Warrants in rem 25 cv 2965_stampedpdf.pdf

---

Ming-Shen Cheng:

Attached please find the Notice Letter, Verified Complaint *in Rem*, Notice of Complaint for Forfeiture, civil cover sheet, and Warrants for Arrest *in Rem*. Pursuant to the attached Notice of Complaint for Forfeiture, all persons asserting an interest in or claim against the defendant properties and who have received direct Notice of the forfeiture action must file a verified claim with the Clerk of this Court pursuant to Rule G(5) of the Supplemental Rules for Admiralty or Maritime and Asset Forfeiture Claims no later than thirty-five (35) days after the Notice is sent, which in this case is on March 25, 2025.

Regards,

Dkt. 6-1. Cheng admitted that he received this email. Dkt. 26-2. Cheng again did nothing. On the evening of June 4, 2025, counsel for Cheng contacted the government via email and arranged for a phone call the following morning. During that phone call on June 5, 2025, counsel for Cheng advised that they represented him only in the civil

matter. The government inquired about whether Cheng would appear in the criminal case and whether Cheng would cooperate in the criminal case. The government still has not received an answer.

Cheng attempts to use his purported failure to understand English as an excuse for his delay in filing a claim in this case; however, he had no issue corresponding with Company A in English about his account being frozen in January and February 2025. He also had no issue signing Company A documents and CLEU documents that were in English. Dkt. 26-3; Exhibit A. Cheng further acknowledges that he understood the import of the government's March 25, 2025 email instructing him that he needed to timely file a claim, as "he immediately began seeking qualified American legal representation." Mot. at 4. Importantly, Cheng does not claim—because he cannot—that he did not understand that the government had frozen his funds and that he needed to timely act.

Instead, Cheng blames the delay on his attempt to find counsel in the United States—but that does not constitute good cause to set aside a default judgment. *See Tygris Asset Fin., Inc. v. Szollas*, No. 09 C 4488, 2010 WL 2610652, at *3 (N.D. Ill. June 21, 2010) ("[A] foreign defendant's difficulty obtaining local representation does not constitute 'good cause' to vacate a default judgment."); *Lyons Partnership, L.P. v. Welle*, No. 08 C 2909, 2010 WL 680877, at *2 (N.D. Ill. Feb. 22, 2010) (holding that defendants' failure to timely retain counsel did not establish good cause to vacate an entry of default); *Inquote Corp. v. Cole*, No. 99 C 6232, 2002 WL 483417, at *2 (N.D.

Ill. Mar. 29, 2002) (holding that out-of-state litigant's difficulty in obtaining counsel did not constitute good cause to warrant setting aside a default judgment).

Cheng relies on two cases to excuse his delay because he was trying to hire counsel, but neither dealt with a known fugitive and both are distinguishable factually. Mot., at 8 (citing *Strabala v. Zhang*, 318 F.R.D. 81, 91 (N.D. Ill. 2016) and *CFTC v. Garofalo*, No. 10 C 2417, 2010 WL 11245430 (N.D. Ill. Dec. 21, 2010). As Cheng conceded in his Motion, he was actively negotiating with his current counsel for weeks prior to the entry of the default judgment (Mot. 4-5), but they both did nothing. Cheng did not inform the Court or the government that he was in the process of obtaining counsel, nor did his current counsel advise that they were in the process of being retained. Cheng further concedes that his current counsel advised of the default judgment on May 29, 2025 (Mot. at 4), and notified Cheng of that fact but it still took them close to a month before filing the Motion—even though preliminary discussions about their potential engagement started on May 1, 2025. *Id*. at 3. Tellingly, Cheng also ignores that one of his cases also denied relief based on similar inaction:

> [The defendant's] silence in the face of two emails attaching crucial court documents and containing an explicit warning of an impending hearing date leads the Court to conclude that he has not shown why he was not put on sufficient notice of the April 29 hearing. The Court recognizes that [the defendant] resides in Tunisia and that retaining an attorney in a foreign country poses significant challenges. Nevertheless, [the defendant] has not given any explanation as to why he made no attempt to address the situation by at least responding to the CFTC's email notice. He does not claim that he never received the emails, that he was unable to read them in English, or that circumstances prevented him

> from requesting an extension of time so that he could be represented at the hearing by counsel. [The defendant] states that he was unable to afford an attorney because his brokerage account holding the profits from the contested trades in this case was frozen on April 20. However, he has not provided any financial statements or other evidence supporting a claim that he was unable to afford an attorney. [The defendant] has been ably represented in this matter since June 14 despite the fact that his brokerage account remains frozen, and he gives no explanation as to why he was able to afford an attorney in June but was unable to do in April.

*Garofalo*, 2010 WL 11245430, at *4.

Cheng knew about this investigation before the indictment and civil forfeiture complaint were brought, was aware that he had been indicted and has a warrant pending for his arrest, failed to timely file a claim, failed to appear in the United States pursuant to the warrant, and waited until after the Court entered a default judgment to appear in these proceedings. And Cheng waited 29 days before even filing a formal motion seeking to vacate the default judgment. His "notice" filed on June 5, 2025 provided no basis for his relief (Dkt. 13), and it still took Cheng another 20 days to file the Motion articulating a purported factual and legal basis for his request for relief—information that has been available to him for months. Cheng has failed to demonstrate good cause, and his Motion should therefore be denied.

## III. Cheng Failed to Carry His Burden Showing Quick Action on His Part

Cheng has not shown that he took quick action to set aside the Court's default judgment. Whether action is quick depends "on the particular circumstances of the defaulted defendant." *Jones*, 39 F.3d at 165 (affirming denial of a Rule 60(b) motion filed five weeks after the default judgment was entered); *Fair Hous. Ctr. Of Cent. Ind.*

*v. New*, No. 19 C 1533, 2021 WL 4949216, at *5 (S.D. Ind. Jan. 20, 2021) (finding that failure to take action for over five weeks was not "quick"); *Sullivan v. Gen. Plumbing, Inc.*, No. 06 C 2464, 2007 WL 1030236, at *4 (N.D. Ill. Mar. 31, 2007) (denying motion to vacate default judgment after a three-week delay).

Cheng knew that Company A had frozen his account in January 2025, and knew by March 2025 that the FBI was investigating the matter. He received a copy of the complaint in this matter and instructions on how to file a claim. He started to engage counsel—by his own admission—on May 1, 2025 weeks before entry of the default judgment. But Cheng waited until June 25, 2025 to file his Motion to set aside the Court's default judgment. His June 5, 2025 "notice" provided no basis to set aside the default, and was still late. Cheng also attempts to argue that the government will not suffer any prejudice here (Mot. at 11), but that ignores the plight of approximately 3,000 American investors who lost money because of Cheng's scheme. The $37 million at issue here is money that Cheng made selling stock to these unwitting retail investors who lost almost everything when CLEU's stock price crashed on January 30, 2025 because of this scheme. Cheng's actions here have delayed the return of this money to these victims. Cheng has failed to show that he took quick action, and his Motion should be denied.

## IV. Cheng Has Failed to Carry His Burden Showing That He Is Meritorious Defense to The Civil Forfeiture Complaint

Cheng has not shown that he has a meritorious defense to the civil forfeiture complaint. A meritorious defense raises a serious question regarding the propriety of

a default judgment supported by a developed legal and factual basis, although it "is not necessarily one which must, beyond a doubt, succeed in defeating a default judgment." *Jones*, 39 F.3d at 165. A meritorious defense requires more than a "general denial" and "bare legal conclusions." *Pretzel & Stouffer, Ctd. v. Imperial Adjusters, Inc.*, 28 F.3d 42, 46 (7th Cir. 1994) (internal quotation marks omitted)). Cheng makes no mention of the fact that a grand jury found probable cause that he participated in a scheme to defraud American retail investors, in violation of both 18 U.S.C. §§ 1343 and 1348(1). If Cheng believed that he had a meritorious defense to the instant case, he would come to the United States to face the criminal case where the government has a higher burden of proof to prove his guilt. His absence is telling.

**A. Wire Fraud and Securities Fraud**

The wire fraud and securities fraud violations underpin the basis for the civil forfeiture in the present matter. The civil forfeiture complaint is based on the same facts as alleged in the indictment. Both the indictment and civil forfeiture complaint allege that Cheng along with his co-schemers manipulated the price of CLEU stock by flooding the market with clandestine CLEU shares that Cheng and his co-schemers purportedly purchased from the issuer.

To prove a violation of 18 U.S.C. § 1343, the government must establish (1) the defendant participated in a scheme to defraud; (2) the defendant intended to defraud; and (3) a use of an interstate wire in furtherance of the fraudulent scheme. *See United States v. Powell*, 576 F.3d 482, 490 (7th Cir. 2009). Defraud means to wrong another

"in his property rights by dishonest methods or schemes," and the term "usually signif[ies] the deprivation of something of value by trick, deceit, chicane or overreaching." *United States v. Stephens*, 421 F.3d 503, 507 (7th Cir. 2005). To prove a scheme to defraud, the government must establish that the defendant made or was responsible for a materially false statement, misrepresentation, promise, or concealed a material fact. *United States v. Weimert*, 818 F.3d 351, 355 (7th Cir. 2016). Intent to defraud is a "willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another." *United States v. Leahy*, 464 F.3d 773, 786 (7th Cir. 2006). The government can establish intent to defraud by showing that the "defendant intended to cause actual or potential loss to the victims of the fraud, whether to enrich himself, another, or no one." *United States v. Ross*, 77 F.3d 1525, 1543 (7th Cir. 1996).

Wire fraud proscribes not only false statements and affirmative misrepresentations but also "the omission or concealment of material information, even absent an affirmative duty to disclose, if the omission was intended to induce a false belief and action to the advantage of the schemer and the disadvantage of the victim." *Weimert*, 818 F.3d at 355; *Stephens*, 421 F.3d at 507 ("A half truth, or what is usually the same thing [as] a misleading omission, is actionable as fraud . . . if it is intended to induce a false belief and resulting action to the advantage of the misleading and the disadvantage of the misled.").

To prove a violation of 18 U.S.C. § 1348(1), the government must prove (1) the defendant's fraudulent intent; (2) a scheme or artifice to defraud; and (3) a nexus with a security. *See United States v. Coscia*, 886 F.3d 782, 796 (7th Cir. 2017). Section 1348(1) does not require that the defendant made a false representation or material omission. *Coscia*, 866 F.3d at 796; *United States v. Higgins*, 270 F.3d 1070, 1073 (7th Cir. 2001). The government must establish that the scheme to defraud was material. *See Coscia*, 866 F.3d at 796; *United States v. Ginsberg*, 971 F.3d 689, 695 (7th Cir. 2020). Pump and dump schemes—the artificial market manipulation to induce unwitting buyers to purchase otherwise worthless stock—constitute a scheme to defraud under both the wire fraud and securities fraud statutes, *see United States v. Pacilio*, 85 F.4th 450, 461 (7th Cir. 2023); *United States v. Offill*, 666 F.3d 168, 171-72 (4th Cir. 2011), as does spoofing—a pattern of deceitful trading entailed by the buying and immediate canceling of orders to purchase securities. *See United States v. Chanu*, 40 F.4th 528, 541 (7th Cir. 2022).

The government need not prove that a defendant personally and directly executed every part of the scheme. *Ginsberg*, 971 F.3d at 696. The evidence must show that the defendant "knowingly, with an intent to defraud, ***participated*** in a scheme involving materially false representations." *Id.* (emphasis added); *see also United States v. Jackson*, 546 F.3d 801, 815-16 (7th Cir. 2008) ("[C]o-schemers are jointly responsible for one another's acts in furtherance of the scheme; so upon finding that [the defendant] was a knowing participant in the scheme, the jury was free to

hold him to account for any fraudulent misrepresentations that were made his [co-schemers] after he joined the scheme.”).

**B. The Civil Forfeiture Complaint Alleges Cheng’s Culpability for both Wire Fraud and Securities Fraud**

The civil forfeiture complaint alleges a multifaceted pump and dump scheme in which Cheng and his co-schemers created a market for secret CLEU shares that he received directly from the issuer while his WhatsApp co-schemers—who had stolen the identities of American investment advisors—duped American retail investors into purchasing an overinflated and worthless penny stock.

Cheng and his co-schemers secretly received approximately 240 million shares of CLEU in late 2024 that the company never disclosed in SEC filings until January 27, 2025. Dkt. 1, ¶ 18. Between receipt of these shares and January 27, 2025, Cheng and his co-schemers—in coordinated fashion—unloaded their CLEU shares between January 23, 2025 and January 29, 2025 to make a market for CLEU shares for unwitting American retail investors who had been targeted by Cheng’s WhatsApp co-schemers. *Id.* at ¶¶ 19-32. Cheng alone made approximately $49 million on these trades through his Company A brokerage account, which he opened shortly beforehand to execute this scheme. *Id.* at ¶34-35. Cheng’s WhatsApp co-schemers, operating in China, misappropriated the identities of American investment advisors and preyed on American retail investors telling those investors to purchase CLEU stock at prices that Cheng and unindicted co-schemers were selling the stock at the same time. *Id.* at ¶¶ 23-32.

Additionally, one week before unloading his CLEU shares, on January 16, 2025, Cheng checked with Company A to make sure that there was no restriction on selling his CLEU shares. Dkt. 1, ¶ 35. Cheng checked with Company A because he knew that there was a problem with his CLEU shares: the company had disclosed publicly to the SEC only approximately 29 million shares, but Cheng had secretly received approximately 9,278,975 CLEU shares—or approximately 32% of the purported outstanding shares that the company falsely reported to the public. There was no reason for Cheng to make this inquiry with Company A unless he knew that there was an issue with his Company A shares—and there was: Cheng knew that he was going to flood the market with CLEU shares that unwitting American retail investors were simultaneously being duped into purchasing. Indeed, the prices that Cheng sold his CLEU shares on January 22, 2025 were the exact same prices that the WhatsApp co-schemers were telling American investors to buy the shares at—showing another layer of coordination between the two.

On January 22 and 23, 2025, Cheng and three of his co-defendants collectively sold approximately 31,484,573 CLEU shares making approximately $176 million, raising a red flag for Company A, which suspended Cheng and his co-defendants from selling any more CLEU shares. Dkt. 1, ¶ 38. But that did not stop Cheng and his co-defendants from continuing to try to manipulate the market. *Id.* at ¶ 40. Cheng and his co-defendants continued to try to manipulate the price of CLEU stock after Company A's freeze on their accounts by entering and immediately canceling more

than 2,500 orders to purchase approximately 56 million shares of CLEU stock. *Id.* The reason was clear: Cheng and his co-defendants wanted to increase the price of CLEU stock because his co-schemers were still actively selling clandestine CLEU shares to unwitting American retail investors who had been duped by Cheng's WhatsApp co-schemers impersonating American retail investors from China. Even though Cheng could not use his Company A brokerage account to sell CLEU stock after January 23, 2025, he continued to try to make the scheme succeed by manipulating the price of CLEU stock. There was no reason for him to do that unless he was acting in concert with his co-schemers.

Cheng argues in his Motion that Cheng was not a knowing participant in any pump and dump scheme. Mot. at 12-17. Not so. The scheme could not have succeeded without Cheng because he created the market for fraudulent CLEU shares. The argument also ignores that Cheng made $49 million in one week trading a penny stock—an absurd return on investment that is circumstantial proof of his participation in a scheme to defraud where American investors on the other side of the trades lost almost the entirety of their investment. The arguments also presume that Cheng—through apparent sheer luck—legitimately made over $49 million in profits on a stock that he held less than a month. No one is that lucky, and certainly not Cheng. Cheng could not have sold the CLEU shares shares and made this type of profit without his WhatsApp co-schemers creating a market for these shares. And these WhatsApp co-schemers were lying to American retail investors about their

identities, the performance of CLEU as a company, and the value of CLEU shares. These lies were meant to induce American retail investors to purchase CLEU stock, and once the WhatsApp co-schemers created a critical mass of buyers, Cheng and his co-schemers sold their stock to the American retail investors.

Cheng argues that he never made a false statement directly to the American retail investors. Mot. at 13-14. This argument ignores that Cheng is liable for the false statements that his co-schemers made directly to American investors, which were material because these investors would not have otherwise purchased CLEU stock. The argument also ignores Cheng's deliberate acts of concealment. Cheng opened his Company A brokerage account to gain access to the American markets so that he could dump his CLEU shares and made a quick and gigantic profit. Once Company A flagged his suspicious trading, Cheng continued to try to manipulate the market by inflating the price of CLEU shares by placing and quickly canceling buy orders. This conduct is further evidence of participation in the scheme. It does not matter that the spoofing occurred after Cheng's $49 million profit (Mot. at 14-15); the spoofing is further evidence of Cheng's intent and his coordination with his co-schemers who were still actively lying to American investors and manipulating the market. Cheng's spoofing trades were also false statements to the market, and to the American retail investors who were still buying CLEU stock at that time because WhatsApp imposters told them to do so. This buying frenzy—exacerbated by Cheng's spoofing—continued to create an uptick in the stock's price.

In sum, this pump and dump scheme required a sophisticated network of actors all who shared the same goal: inflate the price of CLEU stock, lie to American investors to purchase it, sell their inflated shares of CLEU stock, and transfer the money overseas as soon as they could. Cheng committed each step of the scheme, but could not transfer his ill-begotten proceeds overseas. His participation is evidenced by his receipt of secret CLEU shares, concealment of material information about his planned trading strategy from Company A, his selling of CLEU shares at prices set by his WhatsApp co-schemers at the same time that they were duping American retail investors, his making of a market for otherwise worthless CLEU shares, and then trying to artificially inflate the price of CLEU stock after Company A flagged him for suspicious trading. These factors—plus the outrageous $49 million in profits trading a penny stock—evidence Cheng's knowing participation in a scheme to defraud. Because Cheng cannot satisfy his burden to show a meritorious defense, his Motion should be denied.

### C. Cheng Is Not an Innocent Owner of the Seized Funds

Cheng cannot show that he is an innocent owner of the seized funds. At the outset, all the funds seized from Cheng's represent profits from his sales of CLEU stock on January 22, 2025. Cheng only opened this brokerage account to trade the secret CLEU stock that he received from the issuer. His profits also represent the winning and fraudulent side of the trades; the American investors who lost almost the entirety of their investments are on the opposite side of those trades. Put simply,

Cheng's profits in the seized account are ill-begotten proceeds that American retail investors lost because of the fraud scheme.

Cheng has the burden to show by a preponderance of the evidence that he is an innocent owner of the funds by showing that (1) he did not know of the conduct (i.e., the pump dump scheme) giving rise to forfeiture; or (2) he "upon learning of the conduct giving rise to the forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property." 18 U.S.C. §§ 983(d)(1), (2)(A)(i), (ii). The statute further provides guidance on ways in which a defendant "did all that reasonably could be expected," including by giving "timely notice to an appropriate law enforcement agency of information that led the person to know the conduct giving rise to a forfeiture would occur or has occurred," and "in a timely fashion revoked or made a good faith attempt to revoke permission for those engaging in such conduct to use the property or took reasonable actions in consultation with a law enforcement agency to discourage or prevent the illegal use of the property." 18 U.S.C. § 983(d)(B)(i)(I), (II).

*First*, as detailed above, Cheng knew and participated in this pump and dump and profited to the tune of $49 million. *Second*, Cheng did nothing when confronted with the fact that law enforcement was investigating. In early March 2025, Company A advised Cheng to contact the FBI about his account. He did not do so. In June 2025, the government asked counsel for Cheng if he would be willing to cooperate. Cheng has not responded. These are not actions of someone who believed that they were

legitimately entitled to the seized funds at issue. In sum, Cheng's innocent owner defense is a non-starter.

## CONCLUSION

WHEREFORE, the United States of America respectfully requests that the Court deny Ming-Shen Cheng's Motion to Vacate the Default Judgment.

Dated: July 2, 2025

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: */s/ Jared Hasten*
JARED HASTEN
Assistant United States Attorney
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 353-5300
jared.hasten2@usdoj.gov